**In the Matter of an Arbitration Between KARAHA BODAS COMPANY, L.L.C., Petitioner,**

v.

**PERUSAHAAN PERTAMBANGAN MINYAK DAN GAS BUMI NEGARA Respondent.**

**No. CIV.A.H 01–0634.**

United States District Court,
S.D. Texas,
Houston Division.

Dec. 4, 2001.

Kenneth S. Marks, Susman Godfrey LLP, Houston, TX, Christopher F Dugan, Jones Day et al., Washington, DC, for Karaha Bodas Co., LLC.

Michael Lamar Brem, Baker Botts LLP, Houston, TX, Matthew D Slater, Cleary Gottlieb et al., Washington, DC, F Walter Conrad, Jr., Baker Botts, Houston, TX, Jonathan D Schiller, William A Isaacson, Boies & Schiller, Washington, DC, for Perusahaan Pertambangan Minyak Dan Gas Bumi Negara.

Eric Scott Lipper, Hirsch & Westheimer, Houston, TX, for Bank of America.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

This action to enforce an international arbitral award is before the Court on Petitioner Karaha Bodas Company, L.L.C.'s Motion for Summary Judgment Confirming Arbitral Award ("KBC's Motion") [Doc. # 14] to which Respondent Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina") has responded.[1] Having reviewed the parties' briefs, all matters of record and the applicable authorities, the Court concludes that KBC's Motion should be **granted.**

## I. BACKGROUND FACTS

KBC is a Cayman Islands limited liability company that contracted to develop the 400 MW Karaha Bodas Geothermal Project (the "Project") in West Java, Indonesia. Pertamina is an oil and gas corporation owned by the Government of the

---

1. KBC also filed a Memorandum in Support of its Motion for Summary Judgment Confirming Arbitral Award [Doc. # 16] ("KBC's Memorandum"). Pertamina filed its Memorandum in Opposition to KBC's Motion for Summary Judgment ("Pertamina's Response") [Doc. # 29]. In addition, KBC filed a Reply [Doc. # 34] and Pertamina filed a Sur-reply [Doc. # 40].

PT. PLN (Persero) ("PLN"), was a Respondent at the arbitration and was originally named as a Respondent in this action. PLN was not served and has been dismissed from this case, [see Doc. # 44], pursuant to KBC's Notice of Dismissal [Doc. # 43].

Republic of Indonesia and entrusted with the exploration and exploitation of geothermal resources and generation of electricity in Indonesia. PLN is a state-owned electric utility that supplies public electricity in Indonesia.

## A. *The Project*

On November 28, 1994, Pertamina, PLN, and KBC entered into two contracts to establish their roles and obligations in the Project. Pursuant to the Joint Operations Contract ("JOC") between KBC and Pertamina, Pertamina was responsible for management of the geothermal operations and KBC was designated the contractor responsible for financing the Project and building, owning, and operating the generating facilities. *See* Petitioner's Exhibit ("PX") 2, JOC. The Energy Sales Contract ("ESC") among KBC, Pertamina, and PLN, obligated PLN to purchase from Pertamina the electricity generated by KBC's facilities for specified prices. *See* PX 3, ESC.

In almost identical provisions, both the JOC and the ESC required the parties to arbitrate any disputes in Geneva, Switzerland, pursuant to the Arbitral Rules of the United Nations Commission on International Trade Law (the "UNCITRAL Rules"). *See* JOC, Art. 13.2(a); ESC, § 8.2(a), at 18. Additionally, the arbitration provisions required the parties to appoint arbitrators within thirty days of a party's request to initiate arbitration. The JOC provided that "[e]ach party will appoint an arbitrator," while the ESC specified that "PLN on one hand, and COMPANY [KBC] and PERTAMINA on the other hand, will each appoint one arbitrator." *Id.* In the event that an arbitrator was not selected within this thirty-day time frame, both contracts provided that an arbitrator

would, by default, be appointed by the Secretary General of the International Center for Settlement of Investment Disputes ("ICSID") upon the request of any party. *Id.* The JOC and the ESC also contained virtually identical provisions limiting the parties' rights to appeal or otherwise bring legal proceedings concerning a dispute subject to the arbitration provisions. JOC, Art. 13.2(d); ESC, § 8.2(d), at 19.

The Government of Indonesia issued a Presidential Decree dated September 20, 1997 indefinitely postponing the Project. However, KBC continued development of the project based on Pertamina's and PLN's assurances that the Project suspension was temporary and would be restored. The Project was restored briefly by a Presidential Decree dated November 1, 1997, but yet another Presidential Decree dated January 10, 1998 (the "Presidential Decree") confirmed the indefinite postponement of the Project. As a result, Pertamina and PLN did not fulfill their contractual obligations to purchase the energy to be generated by KBC's facilities. In February 1998, KBC gave Pertamina and PLN notice that the Presidential Decree constituted an event of *Force Majeure* under both the JOC and the ESC. On April 30, 1998, KBC served its Notice for Arbitration.

## B. *The Arbitration Proceedings*

In the Notice of Arbitration, KBC appointed Professor Piero Bernardini[2] to serve as an arbitrator. Pertamina, however, did not designate an arbitrator in the allotted time of thirty days or thereafter. Nor did Pertamina contest KBC's selection at that time. By letter dated June 2, 1998, KBC notified the ICSID of Pertamina's

---

2. Prof. Bernardini was at the time Vice Chairman of the International Chamber of Commerce's International Court of Arbitration ("ICC") and Member of the London Court of International Arbitration. KBC's Memorandum, at 6–7.

inaction and requested the appointment of a second arbitrator pursuant to the default appointment provisions of the contracts. *See* PX 8. The ICSID questioned KBC concerning the consolidation of disputes under the JOC and the ESC and KBC's unilateral appointment of an arbitrator, and KBC responded by letter dated June 22, 1998. *See* PX 10. The ICSID confirmed receipt of the June 2 and June 22 letters. PX 11. In a June 29, 1998 letter to all parties, the ICSID recapped the prior correspondence, noted Respondents' failure to respond, and expressed its intent to grant KBC's request to appoint the second arbitrator. *See* PX 12. The ICSID also provided to the parties at this time the name of Dr. Ahmed El–Kosheri and his accompanying curriculum vitae,[3] and requested that any objections to the appointee be proffered by July 13, 1998. The ICSID sent all the preceding correspondence to PLN by courier and to Pertamina by fax and courier. *See* PX 15. Respondents did not object or respond to the potential appointment.[4] On July 13, 1998, having received no communications from Respondents, the ICSID notified them of its intent to appoint Dr. El–Kosheri, *see* PX 16, and made the appointment on July 15, 1998, copying all parties, *see* PX 17. Dr. El–Kosheri accepted the nomination on July 16, 1998. *See* PX 18. Pursuant to the JOC and the ESC, the two appointed arbitrators selected Mr. Yves Derains as Chairman of the arbitration panel (the "Tribunal"), and duly notified the parties. *See* PX 19.

Before proceeding on the merits of the case, PLN requested that the Tribunal first consider certain preliminary issues. *See* PX 21. The Tribunal heard the parties on these preliminary issues on November 19, 1998. Following the hearing, PLN and Pertamina, represented jointly by the same lawyers, submitted a joint memorial, *i.e.*, a memorandum, contending that KBC had improperly attempted to consolidate claims against different parties arising under separate agreements or putative agreements and that the Tribunal had been improperly constituted as the result of (1) the nature of a multi-party arbitration and (2) KBC's failure to honor the arbitrator nomination provisions of the ESC. *See* PX 23, Respondents' Memorial Regarding Preliminary Issues. Respondents participated in further argument on their preliminary objections at a hearing on May 31, 1999.

On October 4, 1999, the Tribunal issued a unanimous Preliminary Award, which held, in pertinent part, that: (1) the Tribunal was properly constituted; (2) KBC was entitled to file its claims, based on the JOC and the ESC, in a single arbitration; and (3) the Government of Indonesia was not a proper party to the arbitration. *See* PX 28, Preliminary Award, at 34.

KBC, after a brief extension of time, filed its Revised Statement of Claim on November 24, 1999. Thereafter, Pertamina and PLN sought, and were granted, a series of extensions to file a response to KBC's Revised Statement of Claim. The Tribunal also granted Respondents' March 6, 2000 joint request for a further extension to accommodate their change of counsel. Ultimately, pursuant to an agreement of the parties that was memorialized in Procedural Order No. 4, KBC filed a Revised Statement of Claim and First Memorial supplementing its claims on November

---

**3.** Dr. El–Kosheri was also a Vice Chairman of the ICC. KBC's Memorandum, at 7.

**4.** KBC responded to the ICSID on July 1, 1998 (with copy to Respondents) that it had no objection to the appointment of Dr. El–

Kosheri. *See* PX 13. The ICSID confirmed receipt of KBC's correspondence on July 2, with copies to Respondents. *See* PX 14. On July 10, the ICSID again forwarded the correspondence to Pertamina. *See* PX 15.

24, 1999; Respondents submitted a Reply and First Memorial on April 7, 2000; KBC submitted a Rebuttal and Second Memorial ("Rebuttal") on May 8, 2000; and Respondents submitted a Rejoinder to KBC's Rebuttal and Second Memorial on June 9, 2000. Procedural Order No. 4 set the hearing on the merits for June 19 through June 30, 2000. *See* PX 38.

Pertamina and PLN sought a further continuance and additional discovery after being served with KBC's Rebuttal, which they claimed contained new assertions and "significant elements of its case in chief" that had not previously been revealed. The Tribunal denied their requests. Further, the Tribunal determined that any adjustment to the proceedings, that could be necessary, would be decided at the end of the hearing. PX 57.

The hearing on the merits began June 19, 2000 and closed on June 23, 2000. The hearing resulted in a transcript of over 800 pages reflecting extensive argument of counsel and live testimony from seven witnesses. Written witness statements were also submitted by the parties. The Tribunal noted that at the conclusion of the hearing, counsel "declared that they waived their respective requests for discovery," and confirmed that they had no objection beyond those already stated as to the conduct of the proceedings. PX 71, Final Award, at 12; *see* Transcript of Arbitration, Vol. V, at 807–08, 814. Post-hearing briefs were submitted on August 7, 2000. PX 71, Final Award, at 13.

On December 18, 2000, the Tribunal issued its Final Award which held that Pertamina and PLN had breached the ESC and that Pertamina had breached the JOC. *Id.* at 24, 47. The Tribunal reasoned that Respondents contractually assumed the risk of the harm created by the Presidential Decree. *Id.* at 19–20. Further, the Tribunal awarded KBC $111,100,000 to recoup its expenditures on the Project,

$150,000,000 in future lost profits, and $66,654.92 in costs and expenses, plus four percent interest from January 1, 2001, until the date of full payment. *Id.* at 47.

KBC seeks enforcement of the Final Award in this proceeding pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958 ("New York Convention"), codified at 9 U.S.C. § 201 *et seq.*

## II. *STANDARD OF REVIEW*

■ The parties agree that the recognition and confirmation of international arbitral awards is governed by the New York Convention. *See* 9 U.S.C. § 201; *Schlumberger Tech. Corp. v. United States*, 195 F.3d 216, 217 (5th Cir.1999). "The goal of the Convention, and the principal purpose underlying American adoption and implementation of it, was to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Imperial Ethiopian Gov't v. Baruch–Foster Corp.*, 535 F.2d 334, 335 (5th Cir.1976) (quoting *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)). The New York Convention is formally incorporated into United States law through implementing legislation found at 9 U.S.C. §§ 201–208.

In keeping with the expeditious nature of arbitration, this implementing legislation provides for a "summary procedure" for enforcement of foreign arbitral awards. *Imperial Ethiopian Gov't*, 535 F.2d at 335. Permissible defenses are few and "the court *shall confirm* the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207 (emphasis added);

*Imperial Ethiopian Gov't,* 535 F.2d at 335–36. The defenses specified in the Convention are narrowly construed to give effect to the Convention's goal of encouraging the timely and efficient enforcement of awards. *In re Arbitration Between Trans Chem. Ltd. and China Nat'l Mach. Import and Export Corp.,* 978 F.Supp. 266, 310 (S.D.Tex.1997), *aff'd,* 161 F.3d 314 (5th Cir.1998). In short, there is a "general pro-enforcement bias" manifested in the Convention. *American Const. Mach. & Equip. Corp. v. Mechanised Const. of Pakistan, Ltd.,* 659 F.Supp. 426, 428 (S.D.N.Y. 1987).

The New York convention contains only seven possible defenses. 9 U.S.C. § 201, Art. V. Recognition and enforcement of the award may be refused if the losing party furnishes proof that: (a) the parties to the agreement were under some incapacity or the agreement was invalid under the law to which the parties have subjected it; (b) the party against whom the award was invoked was not given proper notice of the appointment of the arbitrator, the arbitration proceedings, or was otherwise unable to present his case; (c) the final award deals with a difference not contemplated by the submission to arbitration or is beyond the scope of the submission to arbitration; (d) the composition of the arbitral authority or the arbitral procedure was improper and not in accordance with the agreement of the parties; or (e) the award has not yet become binding or has been stayed by a competent authority. *Id.,* Art. V(1). A court also may refuse confirmation on a arbitral award if it finds (a) the subject matter of the difference between the parties is not capable of settlement by arbitration under the law of the enforcing state or (b) enforcement of the award is or would be contrary to the public policy of the enforcing state. *Id.,* Art. V(2).

 Although it is necessary for the Court to analyze potential New York Con-

vention defenses raised by Pertamina, "[a]bsent extraordinary circumstances, a confirming court is not to reconsider the arbitrator's findings." *Europcar Italia v. Maiellano Tours,* 156 F.3d 310, 315 (2d Cir.1998). A mistake in fact or law is insufficient to refuse confirmation of an arbitral award. *Id.* at 316.

 The burden of proof in confirmation proceedings rests on the party defending against enforcement of the arbitral award, in this case, Pertamina. *Imperial Ethiopian Gov't,* 535 F.2d at 336; *Empresa Constructora Contex Limitada v. Iseki, Inc.,* 106 F.Supp.2d 1020, 1024 (S.D.Cal. 2000); *American Const. Mach. & Equip. Corp.,* 659 F.Supp. at 428.

## III. CONTRACTUAL WAIVER OF OPPOSITION TO ENFORCEMENT

As a threshold matter, the Court must determine whether Pertamina agreed in the JOC or ESC to forgo any defense against enforcement of the arbitration award. KBC contends that the following language, present in both contracts, prohibits Pertamina from opposing KBC's enforcement action:

> The award rendered in any arbitration commenced hereunder shall be final and binding upon the Parties and judgment thereon may be entered in any court having jurisdiction for its enforcement. The Parties hereby renounce their right to appeal from the decision of the arbitral panel and agree that in accordance with Section 641 of the Indonesian Code of Civil Procedure neither Party shall appeal to any court from the decision of the arbitral panel and accordingly the Parties hereby waive the applicability of Articles 15 and 108 of Law No. 1 of 1950 and any other provision of Indonesian Law and regulations that would otherwise give the right to appeal the decision of the arbitral panel. In addition, the Parties agree that neither Party shall

have any right to commence or maintain any suit or legal proceeding concerning a dispute [hereunder until the dispute [5]] has been determined in accordance with the arbitration procedure provided for herein and then only to enforce or facilitate the execution of the award rendered in such arbitration.

JOC, Art. 13(d); ESC, § 8(d). Pertamina contends that this provision does not constitute a waiver of its rights under the New York Convention.

 Neither party has cited a case analyzing language precisely like that in the contracts at issue here. KBC relies on *In re Arbitration Between Chromalloy Aeroservices and Arab Repub. of Egypt*, 939 F.Supp. 907 (D.D.C.1996). However, the holding in that case is not precisely on point. In that case, the United States District Court for the District of Columbia found that an Egyptian ruling nullifying an arbitration award was improper because it was "the clear intent of the parties that any arbitration of a dispute arising under the Contract is not to be appealed to any court." *Id.* at 912. While *Chromalloy* supports the conclusion that language such as that quoted above constitutes a waiver of Pertamina's right to appeal the arbitration award, the current proceeding is not an appeal but an enforcement action. *Chromalloy* did not address the affect of such language on a party's right to raise New York Convention defenses in opposition to an enforcement proceeding.

Pertamina cites *M & C Corp. v. Erwin Behr GmbH & Co.*, 87 F.3d 844, 847 (6th Cir.1996), for the proposition that the contract provisions quoted above do not constitute a waiver of its defenses under the New York Convention. The contract at issue in *M & C Corp.*, provided that "[t]he arbitral award shall be final" and that the

parties have "waived their right to any form of appeal." *Id.* The *M & C Corp.* court determined that notwithstanding the contractual language at issue in that case, the party against whom the award was rendered was entitled to contest the validity and enforceability of the award pursuant to the New York Convention. *Id.* The Sixth Circuit was concerned that to hold otherwise "would insulate [arbitration] judgments from judicial review even in cases involving fraud, procedural irregularities, or exertion of improper influence upon arbitrators." *Id.*

The contractual provisions at issue here are broader than the one in *M & C Corp.* in that they limit not only appeals but the "right to commence or maintain any suit or legal proceeding concerning a dispute hereunder." The Court nevertheless concludes that Pertamina is entitled to rulings on the arguments it raises. The present suit is one in which KBC seeks to enforce an arbitration award which Pertamina opposes. The necessity of a suit to enforce the award was envisioned by the drafters of the JOC and ESC. Implicitly, the parties thus recognized the right to defend against such relief under the New York Convention. Had the drafters intended to deprive an unsuccessful party of all New York Convention defenses in an enforcement proceeding, the drafters could and should explicitly have said so.

The defenses permitted by the New York Convention ensure that arbitral awards meet minimum procedural standards for protecting the litigants' rights. The defenses recognized by the New York Convention do not permit the Court to address the merits of the dispute submitted to arbitration. *See Schlumberger*, 195 F.3d at 220. The Court concludes that Pertamina has not waived its New York

---

**5.** The bracketed text inexplicably is absent from the JOC, but the omission does not affect the meaning.

Convention defenses to enforcement of the arbitral award. Thus, the Court will consider the substantive points raised by Pertamina's Response.

## IV. PERTAMINA'S NEW YORK CONVENTION DEFENSES

Article V of the New York Convention specifies seven limited exceptions to the mandatory enforcement of foreign arbitration awards. "Absent a convincing showing that one of these narrow exceptions applies the arbitral award will be confirmed." *Trans Chem.,* 978 F.Supp. at 309; *see Yusuf Ahmed Alghanim & Sons v. Toys "R" Us,* 126 F.3d 15, 20 (2d Cir. 1997). Pertamina asserts three of the enumerated New York Convention defenses here: (1) the composition and procedure of the Tribunal violated the terms of the parties' agreements (Art. V(1)(d)); (2) the Tribunal deprived Pertamina of due process (Art. V(1)(b)); and (3) the arbitral award violates public policy (Art. V(2)(b)).

### A. Alleged Violations of the Parties' Agreements

■ Article V, § 1(d) of the Convention provides a defense against confirmation of an arbitral award if the respondent can prove that "the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place." 9 U.S.C. § 201, Art. V(1)(d). At least one district court faced with an objection to enforcement of an arbitral award based on Article V(1)(d) has concluded that because

of the clear "pro-enforcement bias" of the New York Convention, it is appropriate to "set aside an award based on a procedural violation only if such violation worked substantial prejudice to the complaining party." *Compagnie des Bauxites de Guinee v. Hammermills, Inc.,* No. 90–0169, 1992 WL 122712, *5 (D.D.C. May 29, 1992); *American Const. Mach. & Equip. Corp.,* 659 F.Supp. at 428. The Court finds the *Hammermills* decision well-reasoned and adopts it as persuasive authority. The Court therefore holds that Pertamina must show that there is a violation of an arbitration agreement between the parties and that the violation actually caused Pertamina substantial prejudice in the arbitration.

Pertamina argues that the Final Award should not be confirmed because first, the Tribunal improperly consolidated the disputes under the JOC and ESC into one arbitral proceeding and, second, the Tribunal was improperly constituted because KBC unilaterally chose an arbitrator in violation of the terms of § 8.2 of the ESC.[6]

### 1. Consolidation of KBC's Claims Under the JOC and ESC

■ Pertamina argues that the arbitral procedure was contrary to the parties' agreements because neither the JOC or the ESC expressly allows consolidation. Because arbitration is a product of contract, courts generally are reluctant to allow consolidation unless the parties consent. *See Government of United Kingdom of Great Britain v. Boeing Co.,* 998 F.2d 68, 72 (2d Cir.1993) (district courts do not have authority to consolidate arbitrations absent the parties consent).

---

**6.** KBC characterizes Pertamina's arguments as "arbitrability" issues, and argues that Pertamina cannot raise such issues here because it agreed to submit them for decision by the Tribunal. The Court disagrees. Disputes concerning breaches of the contracts are encompassed by the contracts' arbitration clauses. To the extent that Pertamina raises issues

as to whether the arbitration procedures were in accordance with the parties' agreements, these matters are not strictly arbitrability questions. However, KBC's contention that these contract issues were fully aired before the Tribunal is well-taken. Absent some clear reason under the New York Convention, the Court will enforce the Tribunal's award.

In this case, the Tribunal approved a single arbitration based on the "connexity" of KBC's claims and the integration of the two contracts.[7] *See* PX 28, Preliminary Award, at 26. The Tribunal found that "the parties did not contemplate the performance of two independent contracts, but the performance of a single project consisting of two closely related parties." *Id.* at 27. The Tribunal had "not the slightest doubt" that a single arbitration was appropriate due to the integration of the two contracts and the fact that the Presidential Decree, the consequences of which are at the origin of the dispute, affected both of them. *Id. Compare United Kingdom,* 998 F.2d at 69 (reversing district court consolidation of arbitration proceedings involving separate, distinct agreements between the United Kingdom and two different parties, absent the parties' agreement).

The Tribunal based its integration finding on the facts that the contracts were signed on the same day; that the JOC expressly provided that the ESC "shall be an integral part of this contract, and to the extent the provisions of the Energy Sales Contract obligate the Parties hereto, shall be deemed incorporated into this contract for all purposes"; and that the ESC provided that it and the JOC together consti-

tute the entire agreement between the parties. PX 28, Preliminary Award, at 26–27. In essence, the Tribunal concluded that the nature of the contracts at issue is such that the parties contemplated arbitration in a single proceeding. This Court strongly concurs. In addition, it is obvious that separate arbitrations of the matters in dispute among the parties under the JOC and ESC would have required substantial duplication of evidence on liability, damages and defensive issues. Pertamina, the only Respondent in this enforcement proceeding,[8] is a party to both the JOC and the ESC. The two Respondents in the arbitration, Pertamina and PLN, were represented by the same counsel at all times during the arbitration. Further, Pertamina has not cited any case in which consolidation was deemed to be in error under similar circumstances.[9]

The Tribunal acknowledged that "the position of each party has to be considered independently when discussing the substance of the case, on the basis of their respective legal and contractual situations" (*Id.* at 28), and carefully adhered to this precept in all its rulings. There is no evidence that the Tribunal failed to distinguish between the positions of Pertamina and PLN in the arbitration. Indeed, the Tribunal went to great lengths to address

7. "Connexity," as explained in the Preliminary Award, relates to the legal relations between KBC and Pertamina on the basis of the JOC on the one hand, and between KBC, Pertamina and PLN on the basis of the ESC on the other hand. PX 28, Preliminary Award, at 26.

8. *See supra* note 1.

9. One treatise, cited by Pertamina in support of its argument that there can be no consolidation absent consent, acknowledges "there is strong support for the view that a judicially consolidated arbitration would be enforceable under the New York Convention where allowed by the governing local law as long as

all parties have agreed (1) to arbitration and (ii) to the same arbitral jurisdiction. Where the parties have in effect agreed to a *lex arbitri,* it is reasonable to infer that they have agreed to be governed by any mandatory requirements of that law regarding consolidation which may override the express choice of the parties in matters of composition and procedure of the arbitral tribunal." ALLAN REDFERN, MARTIN HUNTER, LAW AND PRACTICE OF INTERNATIONAL COMMERCIAL ARBITRATION 187 (2d Ed.1991). In this case, the parties agreed to arbitration and that the arbitration would be conducted in Geneva, Switzerland. Thus, there is a legal foundation for the Tribunal's application of the Swiss law of "connexity" to the consolidation issue.

the contentions of each separately, even though Pertamina and PLN chose to submit joint memorials and were represented by the same counsel at the arbitration hearing. There is simply no showing that these findings by the Tribunal are in error and should not be enforced.

In any event, Pertamina has not demonstrated that it suffered any loss of contract rights from the consolidation. The Court concludes that the consolidation did not violate the parties' agreements. Pertamina has not proven any prejudice from the consolidation. Pertamina thus has failed to meet its burden under the New York Convention to show a violation of Article V(1)(d) that precludes enforcement of the Final Award.

### 2. Appointment of Arbitrators

■ Pertamina also contends that the procedure used to appoint the arbitrators for the arbitration proceedings violated the ESC.

The ESC provides for the appointment of arbitrators as follows:

> PLN on one hand, and COMPANY [KBC] and PERTAMINA, on the other hand, will each appoint one arbitrator, in each case within thirty (30) days after the date of a request to initiate arbitration, who will then jointly appoint a third arbitrator within thirty (30) days of the date of the appointment of the second arbitrator, to act as Chairman of the Tribunal. Arbitrators not appointed within the time limits set forth in the preceding sentence shall be appointed by the Secretary General of the International Center for Settlement of Investment Disputes, upon the request of any Party.

ESC, § 8.2(a). The JOC's procedure for arbitrators' appointment is slightly different:

> Each Party [KBC and Pertamina] will appoint an arbitrator within thirty (30) days after the date of a request to initiate arbitration, who will then jointly appoint a third arbitrator within thirty (30) days of the date of the appointment of the second arbitrator, to act as Chairman of the Tribunal. Arbitrators not appointed within the time limits set forth in the preceding sentence shall be appointed by the Secretary General of the International Center for Settlement of Investment Disputes.

JOC, Art. 13.2(a). Thus, each contract provided for the appointment of arbitrators by the ICSID in the event any party failed to meet its own obligation to do so. There is no question that the Tribunal was constituted in accordance with the express terms of the JOC. The disputed issue is whether KBC's unilateral designation of the first arbitrator violated the ESC.

The Tribunal rejected the Respondent's position that in all disputes under the ESC, KBC *and* Pertamina must jointly appoint one arbitrator while PLN appointed the other. *See* PX 28, Preliminary Award, at 30. The Tribunal found that the ESC arbitration clause applies to the entire contract, not only to disputes aligning KBC and Pertamina on one side against PLN, and that therefore it defied common sense, in a dispute between KBC and Pertamina, to oblige KBC and Pertamina to jointly appoint an arbitrator. *See id.* Because the ESC does not expressly address the method for appointing arbitrators in the KBC v. Pertamina situation, the Tribunal found that the appointment of arbitrators must be made in accordance with UNCITRAL Arbitration Rules, which the parties incorporated into the ESC and which were satisfied in this case.[10] To the extent that the contract interpretation is-

---

10. Section 8.2(a) of the ESC provides that any dispute arising under that contract "shall fi- nally be settled by an arbitral tribunal (the

sue is an arbitrable one, the Court sees no reason under the New York Convention to reject the Tribunal's reasoned analysis of the ESC.

In addition, looking at the issue afresh, the Court concludes that Pertamina has not established a violation of the ESC in regard to the first (or any other) arbitrator's selection. Pertamina has not claimed, before the Tribunal or this Court, that it failed to receive KBC's April 30, 1998 Notice of Arbitration. That Notice included Prof. Bernardini as KBC's choice of arbitrator. Pertamina also has not claimed that it did not receive the IC-SID's June 29 and July 13, 1998 letters, see supra, at 4, informing Pertamina of the ICSID's intention to appoint Dr. El-Kosheri as the second arbitrator.[11] The ICSID's action thus also indicated its acceptance of Prof. Bernardini as the first arbitrator. Nonetheless, Pertamina lodged no objection to the appointment of either Prof. Bernardini or Dr. El-Kosheri.[12]

The Court also rejects Pertamina's contention that KBC's nomination of an arbitrator without Pertamina's consent violates the ESC because Pertamina's construction of the selection procedure renders the ESC's arbitration provision illusory. Under Pertamina's interpretation, Pertamina would hold the unilateral power to prevent the arbitration of disputes between it and KBC arising under the ESC simply by refusing to select or comment on KBC's proposals for an arbitrator. That is not a reasonable interpretation of the expressed intent of the parties as set forth in the ESC. The parties intended that in the event a party failed to name an arbitrator within thirty days of the request for arbitration, the ICSID would do so. In effect, that is the scenario that transpired in this case. KBC nominated an arbitrator. Pertamina had ample notice of this act. The time for Pertamina to object to KBC's selection or for Pertamina to have asserted its right to participate in the first arbitrator's appointment was within thirty days of receiving KBC's Notice of Arbitration and arbitrator selection. In the absence of an objection from Pertamina, nothing in the ESC precluded the ICSID from accepting KBC's nomination for the first arbitrator.[13] This procedure materially complies with the terms of the ESC.[14] Pertamina's belat-

"Tribunal") under the UNCITRAL arbitration rules contained in Resolution 31/98 adopted by the United Nations General Assembly on December 15, 1976 and entitled 'Arbitration Rules of the United Nations Commission on International Trade Law' as in force at the time such arbitration commenced."

**11.** Pertamina apparently argued to the Tribunal that it did not name an arbitrator because it was contesting the legitimacy of the arbitration and further contended that it did not receive certain of the correspondence from the ICSID regarding KBC's request that the ICSID appoint the second arbitrator. See PX 28, Preliminary Award, at 8. Pertamina does not assert these arguments before the Court.

**12.** In fact, Pertamina expressly informed the Tribunal in its Preliminary Memorial that it had no objection to Dr. El-Kosheri, the arbitrator selected by the ICSID. See PX 23, at

36. Thus, Pertamina's objection is solely to fact that KBC was allowed to select one of the arbitrators.

**13.** It is noted that Pertamina still lodged no objection to either the first or the second individual appointed arbitrator.

**14.** There are other viable interpretations of the ESC arbitration clause and the parties' contracts generally that support the procedure used in this dispute. For instance, because the ESC and JOC are expressly integrated contracts, they must be interpreted together to determine the intent of the parties. It is arguable that the parties to the ESC intended to be bound by the arbitration provision (including the provision for the selection of arbitrators) of the JOC when a dispute involved that contract. Under that interpretation, the arbitration provision of the ESC would be operative only in the event the arbi-

ed arguments that Prof. Bernardini was improperly selected are a futile attempt to avoid consequences of its strategic decisions not to object timely to KBC's selection and to decline to participate in the selection of an arbitrator.

■ Moreover, there is no evidence—and Pertamina does not even allege—that Prof. Bernardini, the KBC-selected arbitrator, was biased against Pertamina. Indeed, to the extent Pertamina must show prejudice from the contract violation to support this New York Convention defense, Pertamina's evidence fails even if one assumes that Prof. Bernardini unfairly favored KBC in the arbitration. All the findings and awards were unanimous. *See* PX 28, Preliminary Award; PX 71, Final Award. There is no evidence or even any allegation that the other two arbitrators were not neutral, were biased, or had any conflict of interest. Therefore, Pertamina cannot show that the arbitration selection procedure worked any prejudice to Pertamina. *See Compagnie des Bauxites de Guinee*, 1992 WL 122712, at *5.

The Court accordingly holds that Pertamina has not met its burden to show either that the composition of the Tribunal violated the parties' agreements or that the composition caused Pertamina substantial prejudice.

### B. *Alleged Due Process Violations*

■ The New York Convention allows denial of award confirmation if the party against whom it is invoked can prove that it "was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case". 9 U.S.C. § 201, Art. V(1)(b). This enumerated defense "essentially sanctions the application of the forum state's standards of due pro-

cess." *Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 145–46 (2d Cir.1992). The fundamental requirement of due process is the opportunity to be heard at a "meaningful time and in meaningful manner." *Id.* at 146. Enforcement of the award may be denied only if there was a procedural infirmity that rendered the proceedings fundamentally unfair and caused prejudice to the complaining party. *Hammermills*, 1992 WL 122712, at *5. A fundamentally fair hearing is one that meets the minimum requirements of fairness: adequate notice, a hearing on the evidence, and an impartial decision by the arbitrators. *See Generica Ltd. v. Pharm. Basics*, 125 F.3d 1123, 1130 (7th Cir.1997); *Sunshine Mining Co. v. United Steelworkers*, 823 F.2d 1289, 1295 (9th Cir.1987). The right to due process does not, however, encompass the procedural rights guaranteed by the Federal Rules of Civil Procedure. *Imperial Ethiopian Government*, 535 F.2d at 337; *Empresa*, 106 F.Supp.2d at 1026; *Trans Chem.*, 978 F.Supp. at 310 ("The right to due process does not include the complete set of procedural rights guaranteed by the Federal Rules of Civil Procedure. By agreeing to arbitration [the respondent] subjected itself to its advantages and disadvantages.").

■ Pertamina argues that it was not afforded due process in the arbitration because the Tribunal (1) failed to grant a continuance and denied it further discovery six weeks before the scheduled hearing, and (2) "reversed," without notification, the Preliminary Award. The first of these alleged procedural deficiencies relates to Pertamina's alleged inability to respond adequately to issues raised in KBC's Rebuttal briefing. In connection with its arguments regarding discovery,

---

tration did not include issues arising under the JOC. Alternatively, the contract provisions may be harmonized by applying the ESC

methodology only when KBC and Pertamina both were adverse to PLN and not to each other.

Pertamina further asserts that it is entitled to discovery in this federal court proceeding pursuant to Federal Rule of Civil Procedure 56(f) before the Court rules on KBC's summary judgment motion. The second alleged procedural deficiency relates to Pertamina's perception that the Final Award is contrary to the Tribunal's Preliminary Award, which found that the Government of Indonesia was not a proper party to the arbitration and that Pertamina could not be held liable for the acts of the Government of Indonesia. KBC contends that Pertamina received a full and fundamentally fair hearing.

### 1. Denial of Request for Continuance and Discovery

 *Tribunal's Denial of Continuance and Discovery Requests.*—Six weeks before the hearing, in early May 2000, KBC filed a Rebuttal with the Tribunal. Pertamina contends that it was prejudiced by KBC's Rebuttal because KBC allegedly included an entirely new position on the financing of the Project, made new allegations of the conduct constituting Pertamina's breach, relied on newly-submitted awards in the arbitrations known as *Himpurna* and *Patuha*, identified additional witnesses, and presented new documentary evidence. Pertamina asserts that it was required to secure new experts and fact witnesses and to impose upon its existing experts and fact witnesses to review KBC's Rebuttal submissions in four weeks. Pertamina further contends it had insufficient time post-Rebuttal to prepare for the hearing.

In fact, KBC's Rebuttal did not assert any new claims or new legal theories for recovery. KBC's Rebuttal responded to specific defenses asserted in Respondents' Reply by specifying additional facts, argument, and authority supporting its claims, including the *Himpurna* and *Patuha* awards. The Court is aware of no rule or law that obligated KBC to specify in its

Revised Statement of Claim all evidence it intended to submit, and every argument it intended to make, ultimately to support its claims at the hearing. Pertamina had notice of KBC's claims, and should have anticipated that KBC would contest its defenses. The arbitration proceeding was pending for approximately two years. Pertamina had ample time to prepare its case. Moreover, the fact that KBC's Rebuttal was submitted only six weeks before the hearing was the direct result of Respondents' requests for extensions of time to submit their Reply to KBC's November 1999 Revised Statement of Claim. Pertamina was aware in mid-March 2000, when the Tribunal granted its latest request for an extension of time, that the hearing date remained set for June 19, 2000. *See* PX 38, Procedural Order No. 4. Pertamina did not file its Reply to KBC's Revised Statement of Claim until April 2000, which explains the timing of KBC's Rebuttal.

To the extent Pertamina also contends that it was unfairly denied discovery on the "highly material" issue of KBC's ability to finance the Project, the record does not support the contention. During the two years preceding the filing of the Rebuttal, Pertamina had requested no discovery on this "highly material" issue, even though KBC expressly sought lost profits in its Revised Statement of Claim in November, 1999, and even though Pertamina responded to KBC's claim by arguing that KBC was entitled to no damages because it could not have completed the Project for reasons independent of the Presidential Decree. *See* PX 40, at 6. Moreover, even without the requested discovery, Pertamina presented substantial evidence on the Indonesian economy (information easily accessible to Pertamina and PLN), and expert opinions on the availability of financing, on the size of the "geothermal reserve," and on the "useable resource." *See* PX 39, 41, 42, 43, and 44. Pertamina's

counsel thoroughly cross-examined KBC's witnesses on the issues raised in KBC's Rebuttal. Pertamina, which bears the burden to prove that the hearing was fundamentally unfair, does not identify specific topics or other matters it was prevented from raising; nor does Pertamina identify anything it would have done differently if it had more preparation time. Pertamina refers to the broad, general discovery requests attached to its letter of submission to the arbitrators, see PX 54, but it has not identified a single specific piece or type of evidence it believes exists that would have aided in its defense on these issues. Pertamina has failed to establish under the New York Convention that it was denied a fundamentally fair hearing, and thus denied due process, as a result of the lack of discovery or a continuance after KBC's Rebuttal.[15]

In addition, the transcript of the June 23, 2001 proceedings (the last day of the arbitration hearing) establishes that Respondents informed the Tribunal that they were satisfied with the record as it existed, and that they abandoned their pre-hearing discovery requests:

> MR. CHAIRMAN: May we, before departing have a discussion on what is going to be done now in these proceedings, and we see two items on this particular agenda. There were first a certain number of procedural objections which have been made before this hearing, and in the procedural order we said that this would be decided after the hearing. In summary, there was a request for discovery from one side, and there was objection to the submission of this arbitral award and the business of confidentiality. You remember this discussion.

> MR. MISHKIN [Respondents' Attorney]: I think there was a request for discovery from both sides.

> MR. CHAIRMAN: Our first question is are these requests maintained, all of them, part of them, because we would like to know on what we have to decide.

> MR. MISHKIN: May I just give you my views on that question.

> MR. CHAIRMAN: Yes.

> MR. MISHKIN: And that is that the purpose of discovery is to prepare for the hearing, it is not to supplement the record after the hearing. So I think the discovery requests are moot, and if discovery is now permitted, then you have to re-open the proceedings and so on. So I treated, notwithstanding the fact that it was theoretically open, I treated this request as effectively being denied, and we went forward. Our request went to the purported financial ability, the purported financing that would have been made available and other things, and *I think the record on that has been fully made. I am prepared to rest on that record,* and so *I think discovery requests should no longer be in the picture.*

> MR. SCHILLER [Petitioner's Attorney]: I agree.

> PROF. BERNARDINI [Arbitrator]: And you agree on their withdrawing their request. What about yours?

> MR. SCHILLER: I withdraw my request.

Hearing Transcript, Vol. V, at 807–08 (emphasis added). Thus, Pertamina expressly abandoned its arguments concerning the timing and other alleged procedural defects in the arbitration proceedings.

---

**15.** The issue is not whether this Court would have granted the discovery or the continuance. The question is whether the procedures employed met the minimum requirements of fairness.

In any event, these procedural decisions were well within the reasonable exercise of the Tribunal's discretion. These decisions did not prevent Pertamina from having a meaningful hearing. They do not rise to the level of fundamental unfairness necessary to deny enforcement of the arbitration award.

■ **Pertamina's Rule 56(f) Request for Discovery.**—As another avenue in its due process defense under the New York Convention, Pertamina requests discovery in this lawsuit under the Federal Rules of Civil Procedure. Specifically, Pertamina requests, as it did before the Tribunal, additional discovery related to KBC's ability to finance the Project. KBC opposes Pertamina's request, contending that it is improper under applicable law and the New York Convention, and is unwarranted factually. Pertamina's request for discovery is denied.

■ Rule 56(f) of the Federal Rules of Civil Procedure permits a district court, upon a proper showing by the party seeking Rule 56(f) relief, to delay consideration of a motion for summary judgment pending additional discovery. FED. R. CIV. P. 56(f); *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1441 (5th Cir.1993). "In order to obtain a continuance of a motion for summary judgment for discovery purposes, a party must set forth some statement to the court indicating why additional discovery is necessary and 'how additional discovery will create a genuine issue of material fact.'" *Canady v. Bossier Parish School Bd.*, 240 F.3d 437, 445 (5th Cir. 2001) (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 28 F.3d 1388, 1395 (5th Cir. 1994)). A party "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts." *Krim*, 989 F.2d at 1442 (internal citations omitted). It must show (1) why additional discovery is needed and (2) how that dis-

covery will create a genuine issue of material fact. *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 535 (5th Cir. 1999) (citing *Krim*, 989 F.2d at 1442). If the party has not diligently pursued discovery, however, it is not entitled to relief under Rule 56(f). *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 28 F.3d 1388, 1397 (5th Cir.1994).

Pertamina argues that this Court's review of its New York Convention defenses involves legal issues subject to *de novo* review, but concedes that the Court must defer to the Tribunal's factual findings. Pertamina's Response, at 2. Pertamina also concedes that the grounds for review under the New York Convention typically relate to the existing record and do not otherwise depend on discovery. Pertamina's Response, at 50 (citing *Frere v. Orthofix, Inc.*, Nos. 99CIV4049 and 00CIV1968, 2000 WL 1789641, at *4–*8 (S.D.N.Y. Dec.6, 2000)). Discovery is particularly inappropriate in enforcement proceedings under the New York Convention. *See Imperial Ethiopian Gov't*, 535 F.2d at 337 ("the loser in arbitration cannot freeze the confirmation proceedings in their tracks and indefinitely postpone judgment by merely requesting discovery.").

As noted above, the right to due process protected by the New York Convention does not encompass the procedural rights guaranteed by the Federal Rules of Civil Procedure. *See Imperial Ethiopian Government*, 535 F.2d at 337; *Empresa*, 106 F.Supp.2d at 1026; *Trans Chem.*, 978 F.Supp. at 310 ("The right to due process does not include the complete set of procedural rights guaranteed by the Federal Rules of Civil Procedure. By agreeing to arbitration [the respondent] subjected itself to its advantages and disadvantages."). Pertamina had notice at least as early as November 24, 1999, upon KBC's submis-

sion of its Revised Claim, that KBC was seeking lost profits.[16] *See* PX 31, Revised Statement, at 37. Indeed, the issue of available financing was raised and thoroughly addressed by Pertamina, without the benefit of any discovery, in its Reply to KBC's Revised Statement, *see* PX 40, Respondents' Reply, at 6, and through witness statements. There is no reason to allow the discovery Pertamina requests at this enforcement stage of the proceedings.

Finally, the Court's conclusion that the requested discovery is unwarranted at this stage is supported by statements of Pertamina's counsel at the conclusion of the arbitration hearing. Counsel stated that "discovery is to prepare for the hearing, it is not to supplement the record after the hearing" and that Pertamina's discovery request "went to the purported financial ability, the purported financing that would have been made available and other things, and I think the record on that has been fully made. I am prepared to rest on that record, and so I think the discovery requests should no longer be in the picture." Hearing Transcript, Vol. V, at 807–08.

Even if discovery were appropriate at this late stage in the parties' dispute, and even if the Tribunal made a factual or legal error, Pertamina has failed to meet its Rule 56(f) burden to demonstrate why the requested discovery is material. This Court may not disturb the Tribunal's ruling absent a due process violation, or other ground under the New York Convention. Pertamina has failed to show that the evidence that could be discovered likely would lead to a finding that the arbitration process was fundamentally unfair, constituted a due process violation for some other reason, or violated the New York

Convention in some other way. Thus, Pertamina's discovery request under Rule 56(f) is denied.

In sum, Pertamina has failed to meet its burden to show that circumstances warrant opening the record for additional evidence in this enforcement proceeding. Thus, the Court rejects Pertamina's request for discovery and its argument that KBC's motion for summary judgment is premature.

### 2. "Reversal" of the Preliminary Award

 Pertamina contends that it was denied due process when the Tribunal found it liable for abiding by the requirements of the Presidential Decree despite having determined in the Preliminary Award that a "Government Related Event" is "not deemed to be a breach of contract by Pertamina or PLN but a Force Majeure event excusing KBC's non-performance." PX 28, Preliminary Award, at 19. Further, Pertamina contends that because the Tribunal explicitly stated that the matters to be considered at the hearing on the merits were to be "issues not resolved in this Preliminary Award," it did not have notice that it would be held liable for breach of contract. Pertamina's position misinterprets both the Preliminary Award and the Final Award, and defies logic. The Preliminary Award found that the Government of Indonesia was not a party to the contracts and that Pertamina was not the alter-ego of the Government. However, it expressly recognized that Pertamina *would* bear the risk of loss arising from a Government Related Event:

> likely would include lost profits, and thus raised the issue of financing, because the ESC contemplated that the Project would be completed and electricity sold to PLN.

**16.** In its Notice of Arbitration, KBC claimed it was seeking damages from PLN and Pertamina for breach of both the JOC and ESC. *See* PX 6, Notice of Arbitration, ¶ 17(A). It was apparent at that point that KBC's ESC claim

[T]he parties took care of the close relation of PERTAMINA and PLN with the [Government]. They included in both contracts a definition of "Government [R]elated Event" and, in both contracts, the Force Majeure clause indicates that a "Government [R]elated Event" is an event of Force Majeure with respect to KBC only. This has two consequences for the interpretation of the parties' intention. On the one hand, they were acknowledging that PERTAMINA and PLN had such a close relation with the GOI that a decision of the latter was not a Force Majeure event for them; on the other hand, they were confirming that the [Government] was not a party to the contracts since a governmental decision which prevents KBC to perform its obligations is not deemed to be a breach of contract by PERTAMINA or PLN but a Force Majeure event excusing KBC's non performance.

*Id.*

In the Final Award, the Tribunal found that Pertamina had a contractual responsibility to make KBC whole for a "Government [R]elated Event," not that the Presidential Decree constituted a breach of contract by Pertamina. The Tribunal stated:

[The Preliminary Award] was not meant to express any view as to the consequences for PERTAMINA or PLN of a Governmental decision which prevents the performance of the Contracts. Contrary to Respondents' point of view, the fact that they are not responsible for the Governmental decision to prevent the performance of the Contracts does not exempt them from liability if they do not perform their own obligations in abiding by the decision. The Governmental decisions, in this case the Presidential Decrees n. 39/1997 and n. 5/1998, do not amount to a breach of Pertamina's and PLN's obligations. However, since a Governmental event is not a Force Maj-

eure event for them, their non-performance has no legitimate excuse and must be considered as a breach of contract.

Such distinction is far from being artificial, as the Respondents contend. It applies each time a party is actually prevented from performing its contractual obligations by an event which it cannot invoke as Force Majeure due to the existence of provisions to that effect in the contract or by application of the law.

PX 71, Final Award, ¶¶ 56–57.

Moreover, the Preliminary Award must be read in context with the Notice of Arbitration and all subsequent pleadings by claimant KBC and Respondents. KBC clearly and directly sought relief for alleged breaches of contract. In these circumstances, if Pertamina truly thought the Preliminary Award eliminated its liability for non-performance, then there was nothing left to arbitrate. At the very least, Pertamina had ample notice that the Tribunal would be hearing all of the matters addressed in KBC's Revised Statement of Claim, submitted *after* the Preliminary Award and approximately seven months before the hearing on the merits. Pertamina responded to those claims in its briefing to the Tribunal and thus demonstrated its awareness at the time of the matters in issue. Pertamina's self-serving, erroneous interpretation of the Preliminary Award, does not support a finding that the arbitration was fundamentally unfair. Indeed, Pertamina has failed to demonstrate that the Tribunal's own interpretation of its order is in any way unfounded.

### C. *Alleged Violations of Public Policy*

The Convention allows confirmation of an award to be refused if "the recognition or enforcement of the award would be

contrary to the public policy of that country." 9 U.S.C. § 201, Art. V(2)(b). Pertamina asserts that the Final Award is contrary to United States public policy because it (1) violates the internationally recognized doctrine of "abuse of rights" by awarding lost profits to KBC; and (2) holds Pertamina liable for refusing to violate governing Indonesian law.

■ Application of the public policy exception will succeed in only the narrowest of circumstances; indeed, vacating an arbitral award under this defense requires a violation of the "most basic notions of morality and justice." *Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 593 (7th Cir.2001) (quoting *Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512, 516 (2d Cir.1975)); *see also Europcar*, 156 F.3d at 315; *Industrial Risk Ins. v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1445 (11th Cir.1998); *Parsons & Whittemore Overseas, Co., Inc. v. Societe Generale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 974 (2d Cir.1974). The award must violate an "explicit public policy that is well-defined and dominant ... [and is] ascertained by reference to the laws and legal precedents and not from general consideration of supposed public interests." *Industrial Risk Ins.*, 141 F.3d at 1445 (quoting *Drummond Coal Co. v. United Mine Workers, Dist. 20*, 748 F.2d 1495, 1499 (11th Cir.1984) (internal quotes deleted)).

## 1. Does The Lost Profits Award Constitutes An "Abuse of Rights"?

■ The international "abuse of rights" doctrine put forth by Pertamina in its defense of enforcement of the Final Award is akin to America's "good faith" principle of law. Joseph M. Perillo, *"Abuse of Rights: A Pervasive Legal Concept,"* 27 PAC. L.J. 37, (Fall 1995). Actions constitute an abuse within the scope of the doctrine if: "(1) the predominant motive for the action is to cause harm; or (2) the

exercise of a right is totally unreasonable given the lack of any legitimate interest in the exercise of the right and its exercise harms another; or (3) the right is exercised for a purpose other than that for which it exists." JOHN D. CALAMARI AND JOSEPH M. PERILLO, THE LAW OF CONTRACTS, § 11.39 (4th 1998).

In asserting the "abuse of rights" doctrine, Pertamina does not argue that lost profits are never a legitimate form of damages for breach of contract, but that an award of lost profits in this particular case, when KBC never finished construction on the Project and the Indonesian economy was in ruins, constitutes an abuse of rights in violation of United States public policy.

First, Pertamina falls far short of meeting its burden to show that the "abuse of rights" doctrine is well-defined and dominant in United States law. Pertamina has not cited a single case holding that "abuse of rights" is a recognized doctrine in the United States or applying that doctrine to avoid enforcement of a contractual right. However, even assuming for purposes of the instant motion that "abuse of rights" is an accepted legal doctrine in this country, the facts of this case, as found by the Tribunal, do not meet the elements of an "abuse of rights" as set forth by the authority relied upon by Pertamina. There is no evidence, and thus can be no finding, that KBC's primary motivation was to cause harm to Pertamina or the Indonesian People; that KBC lacks a legitimate interest in asserting its right to lost profits by virtue of its contracts with Pertamina; or that KBC was attempting to exercise its right to recover lost profits for any purpose other than being compensated for its losses caused by Pertamina's failure to perform its obligations under the contracts. The fact that KBC was awarded a substantial sum of money, and Pertamina may think that its resources are better

spent elsewhere, does not satisfy the doctrine.

In arguing that the lost profits award constitutes an "abuse of rights," Pertamina cites two arbitration awards that resulted from the same Presidential Decree that precipitated the arbitration in the instant case. *See* Petitioner's Legal Authorities ("LA") 2, Final Award dated May 4, 1999, *Himpurna California Energy Ltd. v. PT. (Persero) Perusahaan Listruik Negara* ("*Himpurna*"); LA 3, Final Award dated June 11, 1998, *Patuha Power Ltd. v. PT. (Persero) Perusahaan Listruik Negara* ("*Patuha*"). The arbitral tribunal that decided both *Himpurna* and *Patuha* invoked the doctrine of "abuse of rights" to deny the claimants' awards of lost profits. These awards contain extensive discussion of the "abuse of rights" doctrine. *See* Pertamina's Response, at 60–64. A review of those awards reveals that the tribunal was influenced by PLN's status as "an arm of governmental policy acting in pursuit of the public welfare" that had not intentionally deprived the claimant of valuable contractual rights, and by the dire straits of the Indonesian economy.[17]

■ The *Himpurna* and *Patuha* Final Awards were introduced into evidence by KBC, over Pertamina's objection.[18] Perta-

mina contends that despite its objection to those awards, it argued for application of the "abuse of rights" doctrine detailed therein, but the Tribunal ignored the doctrine. *See* Pertamina's Response, at 60. Pertamina's arguments fail for several reasons. First, prior arbitral awards are not precedential authority for the Tribunal or this Court. *See Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 991 F.2d 141, 147 (4th Cir.1993).

Second, it is clear that the doctrine of "abuse of rights" was before the Tribunal, and was not "ignored."[19] The Final Award indicates that the Tribunal in reaching its conclusion considered the state of the Indonesian economy and balanced the harm to Pertamina and PLN against KBC's legitimate interest in enforcing its contractual rights. The Tribunal noted that "the worsening of the economic and political situation in Indonesia at the time has to be taken into account as regards both the conditions at which financing could have been obtained and possible delays in arranging the same." PX 71, Final Award, ¶ 133. The Tribunal further noted, "[t]here is no doubt ... that the Claimant is entitled to obtain the benefit of its bargain in addition to recovering the expenditures it has incurred. As stat-

---

17. It is noted that Pertamina's argument to this Court, that the interests of the Indonesian public demand that Pertamina be immune from liability for lost profits, is at odds with the vigorously defended position in the arbitration that Pertamina and PLN are not the alter-egos of the Indonesian Government. In any event, it is possible that the results in *Himpurna* and *Patuha* are attributable, at least in part, to positions taken by PLN in those cases that are materially different from PLN's positions here.

18. Pertamina's reliance on *Himpurna* and *Patuha* is also somewhat disingenuous given its argument to the Tribunal that those decisions should not be treated as precedents. PX 71, Final Award, ¶ 31.

19. In any event, it is likely that disregard of a principle of law is not a valid basis for avoiding confirmation under the Convention. *See M & C Corp.*, 87 F.3d at 851 n. 2 ("Whatever may be meant by the manifest disregard doctrine applicable in domestic arbitration cases, it is clear that such a doctrine does not rise to the level of a violation of public policy that is necessary to deny confirmation of a foreign arbitral award."); *RAKTA*, 508 F.2d at 977 ("Both the legislative history of Art. V and the statute enacted to implement the United States' accession to the Convention, are strong authority for treating as exclusive the bases set forth in the convention for vacating an award.").

ed in the *Himpurna* award, '[t]o limit the recovery of the victim of a breach to its actual expenditures is to transform it into a lender, which is commercially intolerable when the party was at full risk for the amount of investments made on the strength of the contract.'" *Id.,* ¶ 122. Thus, by awarding KBC its lost profits, the Tribunal necessarily rejected the "abuse of rights" doctrine in light of the facts and arguments presented.

This Court sees no reason to revisit the merits of the Tribunal's factual findings or its Final Award in this regard. The Court concludes that Pertamina has not met its burden to establish that the award to KBC of lost profits violates public policy.

### 2. Does the Final Award Hold Pertamina Liable For "Obeying The Law"

Pertamina lastly contends that the Tribunal held it liable for refusing to violate governing Indonesian law. As discussed *supra* in Section IV.B.2, at 953 – 54, this contention mischaracterizes the Final Award. The Tribunal did not find Pertamina liable for refusing to break the law.[20] Rather, in the Final Award, consistent with the Preliminary Award, the Tribunal found that Pertamina had a contractual responsibility to make KBC whole for a "Government [R]elated Event." The Tribunal thus found Pertamina liable for damages based on the parties' express contractual allocation of the risk of loss. As the Tribunal pointed out, the risk of loss was rational based on Pertamina's close relationship with the Indonesian Government.

Pertamina accordingly has not satisfied its burden to show that the Final Award offends the "most basic notions of morality and justice." Enforcement of the Final Award is not contrary to United States public policy.

---

**20.** Nor did the Tribunal hold that the Presidential Decree constituted a breach of con-

## V. *CONCLUSION AND ORDER*

Pertamina did not waive its right to assert the defenses established by the New York Convention in this case, but has failed to meet its burden of proof on any of its asserted defenses under the New York Convention. The Court finds that the arbitration was not contrary to the contractual agreements of the parties; Pertamina was not denied due process in connection with the arbitration proceeding; and the Final Award does not violate United States public policy. In addition, the Court concludes that Pertamina's request to be allowed to conduct discovery in this enforcement proceeding is without merit. It is therefore

**ORDERED** that KBC's Motion for Summary Judgment Confirming Arbitral Award [Doc. # 14] is **GRANTED.**

The Court will issue a separate Final Judgment.

### *FINAL JUDGMENT*

In accordance with the Memorandum and Order issued this date, it is hereby

**ORDERED** that Petitioner Karaha Bodas Company, L.L.C.'s ("KBC's") Motion for Summary Judgment is **GRANTED.** It is further

**ORDERED** that the Final Award in the Arbitration dated December 18, 2000 is **CONFIRMED.** Therefore, in accordance with the Final Award, KBC shall recover from Pertamina:

(1) $111,100,000.00 for lost expenditures, plus interest at the rate of 4% per annum from January 1, 2001 until the date of full payment;

(2) $150,000,000 for lost profits, plus interest at the rate of 4% per annum from

---

tract by Pertamina, as Pertamina has argued elsewhere.

January 1, 2001 until the date of full payment;

(3) $66,654.92 for costs and expenses of the arbitration, plus interest at the rate of 4% per annum from January 1, 2001 until full payment.

Each party shall pay its own costs incurred in this proceeding.