**KARAHA BODAS COMPANY, L.L.C., Petitioner–Appellee–Cross–Appellant,**

v.

**PERUSAHAAN PERTAMBANGAN MINYAK DAN GAS BUMI NEGARA ("PERTAMINA"), Respondent–Appellant–Cross–Appellee,**

**Ministry of Finance of the Republic of Indonesia, Non–Party–Appellant–Cross–Appellee.**

**Docket Nos. 02–7513(L), 02–7515(CON), 02–7547(XAP), 02–7715(CON), 02–7717(CON), 02–7723(XAP).**

United States Court of Appeals, Second Circuit.

Argued: Aug. 7, 2002.

Decided: Dec. 10, 2002.

See also: 190 F.Supp.2d 936.

Christopher F. Dugan, Jones, Day, Reavis & Pogue (Gregory A. Castanias and Steven C. Bennett, of counsel), Washington, DC, for Petitioner–Appellee–Cross–Appellant.

Matthew D. Slater, Cleary, Gottlieb, Steen & Hamilton (Jonathan I. Blackman, J.J. Gass, and Justin Anand, of counsel), Washington, DC, for Respondent–Appellant–Cross–Appellee.

Carolyn B. Lamm, White & Case (Francis A. Vasquez, Jr., and Frank Panopoluos, of counsel), Washington, DC, for Non–Party–Appellant–Cross–Appellee.

Before: CALABRESI, POOLER, and SACK, Circuit Judges.

SACK, Circuit Judge.

Respondent-appellant Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina") and non-party-appellant the Ministry of Finance of the Republic of Indonesia (the "Ministry") appeal from an April 26, 2002, memorandum and order issued by the United States District Court for the Southern District of New York (Thomas P. Griesa, *Judge*) insofar as it permits petitioner-appellee Karaha Bodas Company, L.L.C. ("KBC") to execute against a portion of the funds in several Bank of America trust accounts that are listed in the district court's order. KBC appeals the same order insofar as it denies KBC's motion to execute against the remainder of the same funds. The question on appeal concerns the ownership of the funds in the Bank of America trust accounts, which derive from sales of Indonesian liquefied natural gas ("LNG"), and whether such funds can be attached under New York law, as applicable pursuant to the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602–1611 ("FSIA"). KBC's claim rests on the allegation that all such funds belong to Pertamina, and on the alternative theory that KBC was entitled to rely on Pertamina's ownership thereof. Pertamina and the Ministry respond that under Indonesian law, the funds belong to the Republic of Indonesia.

We agree with the district court's disposition of the ownership question. The district court correctly analyzed the Indonesian law that controls the ownership of the funds and correctly concluded that most, but not all, of the funds belong to Indonesia. Accordingly, we affirm.

## BACKGROUND

*The Parties*

KBC describes itself as "a Cayman Islands limited liability company formed by two American power companies and other investors, and is 90%-owned by U.S. investors." Petitioner–Appellee's Br. at 2. The Ministry, acting on behalf of the Government of the Republic of Indonesia, is a "foreign state" within the meaning of the FSIA, 28 U.S.C. § 1603(a).[1] Pertamina is an oil and gas company owned and controlled by the Republic of Indonesia. Pertamina engages in oil and gas exploration, extraction, processing, marketing, transportation, and distribution. The 1971 statute creating Pertamina, Law 8 of 1971, explains that the company's goals are "to develop and carry out the exploitation of oil and natural gas ... for the maximum prosperity of the People and the State."[2] Law of the Republic of Indonesia Number 8 Year 1971, Art. 5. The Indonesian government owns all of Pertamina's equity and controls a supervisory board, constituted pursuant to Law 8, that supervises Pertamina's management.[3] Pertamina, for

---

1. 28 U.S.C. § 1603(a) defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." *Id.* None of the parties dispute that the Ministry is a foreign state for the purposes of the FSIA.

2. Pursuant to Government Regulation Number 27 of 1968, Pertamina was initially established as the National Oil and Gas Mining State Enterprise, but was reorganized under Law 8. Prior to Law 8's issuance, the Repub-

lic of Indonesia had authorized different state enterprises to extract and sell natural gas and oil pursuant to Articles 5 and 6 of Law 44 of 1960.

3. Pertamina is currently in a state of legal flux because of changes in its organic statute. Under Law 22 of 2001, Pertamina must, within two years, change "from a state enterprise to a state-owned limited liability company." Decl. of Sudargo Gautama ¶ 37. Law 22 repeals Law 8 and Law 44, but leaves in place

purposes of the FSIA, is therefore "an agency or instrumentality of a foreign state."[4] 28 U.S.C. § 1603.

*The KBC–Pertamina Geothermal Energy Contracts*

In November 1994, KBC executed two contracts—a "Joint Operation Contract" and an "Energy Sales Contract"—with Pertamina and another Indonesian state-owned entity, Persero, for the development of geothermal energy extraction facilities in the Karaha area of West Java. In these contracts, Pertamina waived "any . . . right of immunity (sovereign or otherwise) which it or its assets now has or may acquire in the future." *See, e.g.*, Karaha Geothermal Joint Operation Contract, Art. 21.7(c); Karaha Geothermal Energy Sales Contract, § 15.8(c). Pertamina also "consent[ed] in respect of the enforcement of any judgment against it." Karaha Geothermal Joint Operation Contract, Art. 21.7(d); Karaha Geothermal Energy Sales Contract, § 15.8(d). The contracts did not contain any representations about KBC's right to attach particular assets in case of default or breach. And KBC points to no evidence, either within the contracts' text or in pre-contract negotiations, that Pertamina made any representations regarding its ownership of LNG revenues or its obligation to provide a security interest. Each contract also contained a choice of law clause specifying Indonesian law and

provided that disputes would be resolved by an international arbitral tribunal constituted under the Arbitral Rules of the United Nations Commission on International Trade Law.

In 1997 and 1998, Indonesia experienced a fiscal crisis that induced political instability and the eventual collapse, on May 21, 1998, of the regime led by President Mohamed Suharto. In the course of the crisis, on September 20, 1997, the KBC projects were suspended by an Indonesian "Presidential Decree," along with approximately seventy-four other government-related infrastructure projects. In November 1997, another decree permitted the KBC projects to proceed again, but in January 1998, a third decree terminated the KBC projects once more, despite lobbying by KBC and Pertamina, among others.

*Arbitration on the Geothermal Energy Contracts*

On April 30, 1998, KBC commenced arbitration in Geneva, Switzerland, alleging that the project's termination constituted a breach of the geothermal energy contracts. On September 30, 1999, the Swiss arbitral panel issued a preliminary ruling rejecting Pertamina's objections to arbitration and concluding that all of KBC's claims could be addressed in a unitary proceeding. The arbitral panel also rejected KBC's motion to treat the Republic of Indonesia

---

implementing regulations that supplement those laws. Draft Law of the Republic of Indonesia Number 22 of 2001, Art. 66. But "Law 22/2001 has not yet been implemented with respect to Pertamina." Supp. Decl. of Sudargo Gautama ¶ 6. The parties' experts on Indonesian law apparently agree that this case should be decided according to the pre-Law 22 regulations. *See* Decl. of Sudargo Gautama ¶ 36; Decl. of Robert N. Hornick ¶ 14.

**4.** 28 U.S.C. § 1603 includes any entity in which a government has "a majority of . . . shares or other ownership interest." 28 U.S.C. § 1603(b). "A typical governmental instrumentality . . . is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law." *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 624, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). Pertamina satisfies this description.

as a party to the geothermal energy contracts.

In a December 18, 2000, award, the arbitral panel concluded that KBC had been "prevented from pursuing the performance of the binding contracts that it relie[d] upon for reasons beyond its control ... [and] should not bear the consequences thereof." Final Award in an Arbitration Procedure Between KBC and Pertamina and Persero, at 31. The arbitral panel awarded KBC damages for lost investments of $111.1 million and lost profits of $150 million plus interest and fees. *Id.* at 35–47. On February 1, 2001, Pertamina filed an appeal in the Supreme Court of Switzerland. The appeal was dismissed on April 24, 2002. Pertamina also asked an Indonesian court to enjoin enforcement and annul the award.[5]

*Proceedings in the Southern District of Texas*

KBC sought enforcement of the award in the United States District Court for the Southern District of Texas pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, implemented by Chapter Two of the Federal Arbitration Act, 9 U.S.C. §§ 201–208. Rejecting Pertamina's numerous asserted defenses, the district court (Nancy Atlas, *Judge*) entered final judgment on December 4, 2001, in the amount of $261.1 million and interest at the rate of four percent per annum for KBC.[6] *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 190 F.Supp.2d 936, 957 (S.D.Tex. 2001). Pertamina's appeal of that order is pending before the Fifth Circuit.

KBC, in an attempt to enforce the judgment, then moved before the Southern District of Texas to register that judgment in other judicial districts within the United States pursuant to 28 U.S.C. § 1963.[7] KBC filed with the court, among other papers, an affidavit alleging that Pertamina had assets in seven New York banks. Judge Atlas held that KBC had fulfilled the requirement of 28 U.S.C. § 1610(c) that a party seeking to attach a foreign sovereign's property refrain for "a reasonable period of time" after judgment, and permitted KBC to register the judgment in Delaware, New York, and California federal district courts. On February 15, 2002, Judge Atlas also granted KBC's motion for an *ex parte* writ of garnishment against Bank of America.

*Proceedings in the Southern District of New York*

On February 22, 2002, KBC presented the December 4, 2001, Southern District of Texas judgment to the United States District Court for the Southern District of New York for registration. The same day, the latter court issued an *ex parte* writ of execution and order to show cause pursuant to Fed R. Civ. P. 69(a) and 28 U.S.C. § 1610(c) "author[izing KBC] to execute upon any property of Pertamina within this jurisdiction in satisfaction of the out-

---

**5.** Pertamina filed suit on March 14, 2002, in Indonesia, requesting both annulment of the arbitral award and an injunction preventing KBC from enforcing the arbitral award. A court in Jakarta, Indonesia enjoined KBC from taking action to enforce the judgment anywhere in the world, threatening a $500,000 per diem fine for violations.

**6.** In response to the Indonesian order annulling the arbitral award, *see supra* note 5, Judge Atlas issued her own injunction barring Pertamina from requesting enforcement of the Indonesian order. Tr. of March 29, 2002 Hearing Before Judge Atlas, at 5–6. Judge Atlas's injunction has been appealed to the Fifth Circuit.

**7.** 28 U.S.C. § 1963 permits registration of a judgment "when ordered by the court that entered the judgment for good cause shown." *Id.*

standing final judgment, amounting, to date, in total to the sum of $261,166,654.92 plus interest from January 1, 2001." Pursuant to Fed.R.Civ.P. 69(a) and N.Y. C.P.L.R. § 5222(b),[8] the district court issued restraining notices, which KBC subsequently served upon Bank of America and several other banks.

*The Nature of the Disputed Funds*

This appeal concerns fifteen trust accounts at Bank of America.[9] These accounts contain funds from the sale of LNG extracted in Indonesia under arrangements called Production Sharing Contracts ("PSCs"), which are governed by Indonesian law.

As mandated by Indonesian law, Pertamina enters into PSCs with private oil and gas contractors for the extraction of Indonesian crude oil and natural gas.[10] The Republic of Indonesia is not party to the PSCs, but it must approve them. Under a PSC, the private contractor (the "PSC contractor") is responsible for all exploration, development, extraction, production, transportation, and marketing operations related to a specified geographic area under Pertamina's management. As part of their compensation, PSC contractors initially receive a share of the oil or natural gas after extraction. They then transfer the remaining oil or gas to Pertamina.

Pertamina, transports the gas for domestic sale or for conversion into LNG at liquefaction plants. Pertamina sells LNG to foreign buyers pursuant to long-term sales contracts that contain choice of law clauses specifying New York law as governing the contracts. LNG sales were the "largest single source of Pertamina sales revenue" in the last nine months of 2000. Decl. of Robert N. Hornick ¶ 22. Buyers of LNG remit payment to specified trust accounts in New York. In all such LNG sales, Pertamina, in its own name, purports to transfer title to the LNG, or title to the refined product, to the buyer. Pertamina warrants that it has "good title to the [LNG], free of all liens and encumbrances of any kind." *Id.* ¶ 23(b). Revenues from sales of natural gas are also sent to trusts in New York. The trusts "distribute the proceeds in accordance with trust agreements and ultimately to the [PSC contractor] in accordance with their respective [PSCs]." Decl. of Sahala L. Gaol ¶ 9. However natural gas is sold, and whether or not it is liquefied, proceeds from sales are first paid into trust accounts such as those at Bank of America.

Bank of America is the trustee of the accounts deposited with it. Before making any allocations or distributions, it credits all LNG revenues from a particular project, or subpart of a project, to a general account. The general accounts and other subaccounts are operated pursuant to con-

---

**8.** Rule 69(a) provides, "Process to enforce a judgment for the payment of money shall be a writ of execution.... The procedure on execution ... shall be in accordance with the practice and procedure of the state in which the district court is held...." Fed.R.Civ.P. 69(a).

**9.** The district court's analysis (and hence this appeal) does not concern trusts "containing non-PSC Operating Income: the Musi II, Exor I, Cilacap and the throughput fee portion of the East Java Pipeline trusts." Final

Order ¶ 17. The district court concluded that the record was "insufficient to determine whether KBC is entitled to execution against these accounts." *Id.* ¶ 18.

**10.** Geothermal energy contracts and PSCs are different. Pertamina entered into geothermal energy contracts with KBC for the purposes of developing extraction facilities. Pertamina entered into PSCs with private oil and gas contractors for the purposes of extracting oil and natural gas.

tractual arrangements known as Trustee and Paying Agent Agreements ("TPAA") that define the trustee's obligations. TPAAs are signed by Bank of America, Pertamina, and relevant PSC contractors, but only Pertamina has authority to direct payment. *See, e.g.,* Bontang V Trustee and Paying Agent Agreement of July 1, 1995, Art. 3.5(b)(i). Like the LNG sales contracts, the TPAAs also contain choice of law clauses specifying New York law as governing. *Id.* Art. 13.6.

Before any distribution can be made to Pertamina or the PSC Contractor, the TPAAs specify that production expenses— which include debt service payments, production costs, and trustee expenses—must be paid first. *Id.* Art. 3.3–3.4. After production payments are made, the "PSC Revenue" or the "Net Operating Income" remains in the general trust account. This remainder is essentially the net profit from the PSC, after costs have been deducted and debts have been serviced.

The PSC Revenue is then divided between Pertamina and the PSC Contractor for a particular project in contractually specified portions known as "Production Sharing Percentages." These payments are made to separate subaccounts or separate line accounts within the general trust account. *Id.* at 8. The funds at issue in this appeal are, thus, Pertamina's Production Sharing Percentage or, in the terms used in the contracts, Pertamina's share of the Net Operating Income.

Pertamina's Production Sharing Percentage is transferred directly to the Republic of Indonesia. Indeed, "Pertamina, at the direction of the Indonesian Government, has issued standing instructions to the Trustee to pay its Production Sharing Percentage to an account of the Government of Indonesia at Bank Indonesia." Decl. of Ainun Na'im ¶ 23. Evidence submitted by the Ministry and Pertamina sug-

gests that twenty percent of the Indonesian national budget derives from oil and natural gas revenues. *See* Decl. of Sahala L. Gaol ¶ 11. The funds are typically used to maintain Indonesia's foreign exchange reserves, and thus to service Indonesia's foreign debt. *Id.* ¶ 12.

### The LNG Security Arrangement

One noteworthy feature of the trust arrangements is the mechanism whereby Pertamina borrows funds for the construction of natural gas liquefaction facilities, without requiring a counter-party lender to depend on Pertamina's willingness or ability to assure repayment. For example, the record contains 1997 loan agreements for funds to create a natural gas liquefaction facility. One loan agreement explains that "certain proceeds of liquefied natural gas" that are held in trust accounts at Bank of America are the "*sole* source of repayment." Bontang VI Loan Agreement of March 4, 1997, at 2 (emphasis added). A fixed percentage of gross revenues from LNG revenues in the trust accounts is therefore allocated to loan repayment, and only after loan repayments are complete can other disbursements be made. Through this device, the LNG revenue stream structure protects lenders' interests.

### The District Court's Opinion and Order

On March 23, 2002, Pertamina filed papers opposing KBC's order to show cause for a writ of execution on the ground that none of the restrained accounts contained property owned by Pertamina. The previous day, the Ministry, purporting to be a "Non–Party with Interest," had also filed a memorandum of law arguing that the restraining notices and writs of execution should be quashed.

Following supplementary briefing, the district court held a non-evidentiary hearing on April 5, 2002, and delivered an oral

decision on the ownership and disposition of the restrained funds in the trust accounts. According to the district court, "the ultimate ownership of the money ... does not have to appear in the trustee and paying agent agreement," so the TPAAs' designation of Pertamina as trust owner was not dispositive. Tr. of April 5, 2002 Hearing, at 10–11. Nor could Pertamina's practice of paying the funds directly to the Republic of Indonesia dispose of the question. *Id.* at 51. The district court reasoned instead that the ownership of the LNG revenues in Pertamina's subaccount was a matter of Indonesian law, which explicitly allocated ownership rights in the funds. *Id.* at 80–81. Canvassing Indonesian law, the court concluded that Article 5(2) of Government Regulation 41 of 1982 vested ownership of all funds, except for a portion called the "Retention," in the Republic of Indonesia. "What is decisive on the question of property rights is a provision of Indonesian law which became effective in 1982 and article 5 of that law." *Id.* at 81. It allocated Pertamina's Production Sharing Percentage, less five percent of the Net Operating Income (which is designated Pertamina's "Retention"), to the Republic of Indonesia. This 1982 law, noted the district court, distinguished the Republic of Indonesia's interest from Pertamina's tax and dividend obligations. *Id.* at 83. Therefore, the only portion of the funds that KBC could attach was the five-percent portion—i.e., the Retention—which belonged to Pertamina. The district court memorialized its decision in a written order on April 26, 2002.

*This Appeal*

Pertamina and the Ministry appeal the district court's order and challenge its conclusion that the Retention is owned by Pertamina. The Ministry also contends that once the district court had concluded that the remaining funds belonged to the Republic of Indonesia, sovereign immunity foreclosed any further restraint of those funds. KBC appeals the portion of the order that is based on the district court's conclusion that KBC could not execute against the entirety of Pertamina's Production Sharing Percentage.

On June 18, 2002, we denied KBC's motion to dismiss the appeal, and permitted both the Ministry and Pertamina to appeal pursuant to either 28 U.S.C. § 1292(b), the collateral order doctrine, or both. We observed that the collateral order doctrine might apply because this appeal raised an issue of sovereign immunity, but expressly reserved judgment on the jurisdictional issues. Finally, we modified the stay to apply only to those funds that would be necessary and sufficient to satisfy a judgment.

## DISCUSSION

I. Standard of Review

In a proceeding under the FSIA, "[t]he standard of review established for district court decisions regarding subject matter jurisdiction is clear error for factual findings and *de novo* for legal conclusions." *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 930 (2d Cir.1998). *De novo* review is appropriate even where the district court supplements the complaint with "undisputed facts from the record," as the court did here. *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 138 (2d Cir.2001) (citation and quotation marks omitted).

"Likewise, pursuant to Fed. R.Civ.P. 44.1, a court's determination of foreign law is treated as a question of law, which is subject to *de novo* review." *Curley v. AMR Corp.*, 153 F.3d 5, 11 (2d Cir.1998). Finally, the district court's choice of law determination is also subject to *de novo* review. *Id.*

## II. Subject Matter Jurisdiction

Prior to consideration of the appeal's substance, we address two threshold subject matter jurisdiction questions: whether our statutory subject matter jurisdiction properly obtains and whether the Ministry is a proper party on appeal.

### A. Statutory Appellate Jurisdiction

■ Ordinarily, appeals are permitted only from "final decisions of the district courts." 28 U.S.C. § 1291. One exception to this rule, contained in 28 U.S.C. § 1292(b), however, permits appellate jurisdiction over interlocutory civil orders "[w]hen a district judge ... [is] of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation," and so certifies in a written order. 28 U.S.C. § 1292(b). Upon entry of such an order, the court of appeals has the discretion to accept or decline jurisdiction. *Id.*

On April 24, 2002, the district court certified this case for appeal under 28 U.S.C. § 1292(b). Final Order of April 24, 2002, at 6. The prerequisites for appellate jurisdiction are satisfied. First, the interaction of federal, New York, and Indonesian law poses "substantial ground for difference of opinion." 28 U.S.C. § 1292(b). Second, our review of the district court's order will advance the litigation by resolving the disposition of funds that allegedly belong to a foreign sovereign. Pursuant to our discretion under 28 U.S.C. § 1292(b), we therefore accept jurisdiction to hear this appeal.[11]

11. Having accepted jurisdiction under 28 U.S.C. § 1292(b), we need not determine whether the collateral order doctrine provides an alternative vehicle to hear this appeal. *See*

### B. The Ministry as Appellant

■ KBC did not name the Ministry as a party in its action to enforce the Swiss arbitral award in the Southern District of Texas. *KBC*, 190 F.Supp.2d at 939. Judge Atlas's final order names only Pertamina as a respondent. And the order certified in the Southern District of New York on February 22, 2002, again mentions Pertamina alone. Not until March 22, 2002, after the funds in the Bank of America trust accounts were attached, did the Ministry appear in the district court, then characterizing itself as a "Non–Party with Interest."

■ At first blush, the Ministry's absence from the initial proceedings and its failure to intervene pursuant to Fed. R.Civ.P. 24 seem to preclude its participation in this appeal. "[O]nly parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." *Marino v. Ortiz,* 484 U.S. 301, 304, 108 S.Ct. 586, 98 L.Ed.2d 629 (1988) (per curiam). But, as the Supreme Court recently made clear, the Ministry is indeed a "party" to the district court's judgment for present purposes, and can therefore properly appeal.

■ In *Devlin v. Scardelletti,* 536 U.S. 1, 122 S.Ct. 2005, 2008, 2013, 153 L.Ed.2d 27 (2002), the Court held that an unnamed member of a class could appeal a class action settlement at a fairness hearing even though he had failed to intervene earlier. The Court cautioned that "[t]he label 'party' does not indicate an absolute characteristic, but rather a conclusion about the applicability of various procedural rules that may differ based on context." *Id.* at 2010. To determine who may ap-

*Excimer Assocs. v. LCA Vision, Inc.,* 292 F.3d 134, 138 (2d Cir.2002) (describing the collateral order doctrine).

peal, courts must ascertain whether putative appellants are "bound by the order from which they were seeking to appeal." *Id.* In *Devlin,* for instance, the appellant faced a "final decision of [a] right or claim sufficient to trigger his right to appeal." *Id.* (citation and internal punctuation omitted).

Similarly, we have long allowed appeal "when the nonparty has an interest that is affected by the trial court's judgment." *United States v. Int'l Bhd. of Teamsters,* 931 F.2d 177, 183–84 (2d Cir.1991) (quoting *Hispanic Soc'y v. N.Y. City Police Dep't,* 806 F.2d 1147, 1152 (2d Cir.1986), *aff'd, Marino v. Ortiz,* 484 U.S. 301, 108 S.Ct. 586, 98 L.Ed.2d 629 (1988)); *accord West v. Radio–Keith–Orpheum Corp.,* 70 F.2d 621, 624 (2d Cir.1934). "The question therefore is whether the putative appellant can identify an 'affected interest.'" *Kaplan v. Rand,* 192 F.3d 60, 67 (2d Cir.1999). The Ministry alleges that the Republic of Indonesia owns the property encompassed by the garnishment order. Under *Devlin, Kaplan,* and similar cases, this constitutes an "affected interest," which entitles the Ministry to join this appeal.

### III. Execution Against or Attachment of Foreign Sovereigns' Property

██ Attachment of a foreign state's property in the United States is governed by the FSIA. In relevant part, the FSIA provides that "the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of [the FSIA]." 28 U.S.C. § 1609. Section 1610 provides different regimes for sovereign states on the one hand, and their agencies and instrumentalities on the other. First, 28 U.S.C. § 1610(a) provides that any property of a foreign sovereign that is

used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States ... if ... (1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver.

*Id.* Second, § 1610(b), which concerns foreign states' instrumentalities, such as Pertamina, provides in relevant part that:

any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States ... if ... (1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver.

*Id.* Subsection (a) is generally thought to be narrower than subsection (b). *Connecticut Bank of Commerce v. Republic of Congo,* 309 F.3d 240, 252–65 (5th Cir.2002). While subsection (b) applies to *all* property of the agencies and instrumentalities of foreign states, subsection (a) applies only to the property of foreign states that is "used in commercial activity." *Id.*

██ In the appeal before us, sample geothermal energy contracts between Pertamina and KBC state that Pertamina "waive[s] any ... right of immunity (sovereign or otherwise) which it or its assets now has or may have in the future." Karaha Geothermal Joint Operation Contract,

Art. 21.7(c); Karaha Geothermal Energy Sales Contract, Art. 15.8(c). Pertamina, through its use of the trust funds to channel LNG revenues, engages in commerce in New York. Under 28 U.S.C. § 1610(b), Pertamina has thus waived its sovereign immunity from attachment in United States courts.[12]

### A. Attachment Under the FSIA and New York Law

 The FSIA states that when a foreign state is not protected by sovereign immunity, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. In attachment actions involving foreign states, federal courts thus apply Fed.R.Civ.P. 69(a), which requires the application of local state procedures. See Alliance Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A., 190 F.3d 16, 20 (2d Cir.1999) (applying Rule 69(a), and hence New York law, in an FSIA action).

In the instant action, the district court is located in New York state. We therefore apply New York law to determine what assets are "subject to enforcement, and thus available to judgment creditors." Alliance, 190 F.3d at 20. "New York procedure for enforcement of judgments is set out in Article 52 of the Civil Practice Law and Rules. The first section of Article 52 describes the assets that New York law has made subject to enforcement, and thus available to judgment creditors." Id. The relevant provision, N.Y. C.P.L.R. § 5201(b), states that:

**Property against which a money judgment may be enforced.** A money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested, unless it is exempt from application to the satisfaction of the judgment.

 Id. In New York, then, a party seeking to enforce a judgment "stand[s] in the shoes of the judgment debtor in relation to any debt owed him or a property interest he may own." Bass v. Bass, 140 A.D.2d 251, 253, 528 N.Y.S.2d 558, 561 (1st Dep't 1988). Nonetheless, a party cannot "reach ... assets in which the judgment debtor has no interest." Id. A determination of Pertamina's property interest in the disputed funds—i.e., whether Pertamina can "assign or transfer" any of these funds—is therefore dispositive of this appeal. N.Y. C.P.L.R. § 5201(b).

### B. Ownership of the Disputed Funds

While the litigants agree that New York law governs what property can be attached, they diverge on what law governs the property rights of the Republic of Indonesia and Pertamina in the disputed funds. KBC argues that under New York law, Pertamina owns the Production Sharing Percentage because Pertamina controlled the allocation of the funds within the trust accounts and retained initial title to the LNG, which it sold to generate the disputed funds. KBC finds no significance in the fact that much of those funds flow to the Republic of Indonesia. In KBC's view, these funds merely represent "various royalties, taxes, and dividends" which "Pertamina is obligated to pay the Government." Decl. of Robert N. Hornick ¶ 24. KBC argues that before those obligations are met, the funds belong to Pertamina. KBC's expert also argues that Indonesian

---

12. Because this is an appeal from an order executing a judgment against the property of Pertamina—as opposed to the property of the Ministry or the Republic of Indonesia—the sovereign immunity claims of the Ministry or the Republic of Indonesia are not before us.

law does not vest the Republic of Indonesia with any ownership interest in these funds. *See id.* at ¶¶ 24–49.

Both Pertamina and the Ministry argue to the contrary that Indonesian law deprives Pertamina of all but a future property interest, limited to five percent of the Net Operating Income, while the Republic of Indonesia has the exclusive right to the rest of Pertamina's Production Sharing Percentage. They, like the district court, identify Government Regulation 41 as providing the dispositive rule of decision:

> Article 5 (1) The retention (fee) received by Pertamina with regard to the Production Sharing Contract shall be 5% (five percent) of the Net Operating Income of the relevant Production Sharing Contract.
>
> (2) The difference between portions received by Pertamina according to each Production Sharing Contract and the retention (fee) received by Pertamina as intended in paragraph (1) of this Article *shall be the Government's portion.*

Government Regulation of the Republic of Indonesia Number 41 of 1982, Art. 5 (emphasis added). According to Pertamina's expert, "[t]his [provision] means that the Government owns the Percentage Share due to Pertamina under the PSC, but must pay Pertamina the five percent fee," or the Retention. Supp. Decl. of Sudargo Gautama ¶ 4.

Pertamina also argues that even the Retention, which equals five percent of the Net Operating Income, cannot be attached. Pertamina contends that before it transfers its Production Sharing Percentage to the Republic of Indonesia, the latter *owns*

all the PSC Revenue as a result of Government Regulation 41. Only after the revenue reaches Jakarta does Pertamina receive the Retention. And even in Jakarta, Pertamina is not entitled to the entire Retention. Regulation 41, in Article 5(3), subjects the retention to a sixty percent tax. A second regulation, Government Regulation 73, then mandates payment of a fifty percent dividend to the government. In all, Pertamina actually receives one-fifth of the Retention.[13]

Resolution of this appeal requires that we determine the legal ownership of the PSC Revenues. At the threshold, we must consider which choice of law rule governs the question of ownership.

## IV. Choice of Law Analysis

### A. Federal or State Choice of Law Rules

"[R]ather than directing courts to apply the choice of law rules of the place of [the relevant events], the FSIA implicitly requires courts to apply the choice of law provisions of the forum state with respect to all issues governed by state substantive law." *Barkanic v. Gen. Admin. of Civil Aviation of the People's Republic of China,* 923 F.2d 957, 959 (2d Cir.1991); *accord Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 12 (2d Cir.1996) ("[T]he FSIA ... operates as a 'pass-through' to state law principles."). In *Barkanic,* we reasoned that the FSIA "expressly embraces the goal of holding foreign states liable in the same manner and to the same extent as a private individual under like circumstances." *Barkanic,* 923 F.2d at 960 n. 3 (internal

---

**13.** For instance, if the PSC Revenue were $100, the Pertamina's retention would be $5, or five percent. Under the terms described in Pertamina's annual reports, though, the PSC Revenue would be divided: $35 would go to the PSC contractor, and $65 would go to

Pertamina in New York, then be transferred immediately to the Ministry in Jakarta. Once the $65 reached Jarkarta, Pertamina would receive $5. After taxes and dividends, however, Pertamina would only retain $1.

citation and quotation marks omitted). *Barkanic* suggests that New York choice of law rules govern.

██ The Ministry argues that *Barkanic* applies only to questions of "liability," and does not extend to questions about "the amenability of the sovereign to suit." Ministry Reply Br. at 16. The latter questions, the Ministry argues, are governed by federal common law choice of law rules. *Id.* (emphasis omitted). But in *Barkanic*, we explained that in FSIA cases, we use the forum state's choice of law rules to resolve *"all* issues," except jurisdictional ones. *Barkanic*, 923 F.2d at 959, 961 (emphasis added). Determining what property Pertamina owns is not a jurisdictional question, which would require application of federal law. Jurisdiction has already been established pursuant to 28 U.S.C. § 1610(b)(1) by the contractual waiver of immunity. Like the *Barkanic* court, we now determine only the scope of recovery.[14] New York choice of law rules therefore govern our decision.

*B. New York or Indonesian Property Law*

██ Under New York law, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co. & Stolarz*, 81 N.Y.2d 219, 223, 613 N.E.2d 936, 937, 597 N.Y.S.2d 904, 905 (1993); *accord Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998). In property disputes, if a conflict is identified, New York choice of law rules require the application of an "interests analysis," in which "the law of the jurisdiction having the greatest interest in the litigation [is] applied and ... the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Koreag, Controle et Revision S.A. v. Refco F/X Assoc. Inc.*, 961 F.2d 341, 350 (2d Cir.), *cert. denied*, 506 U.S. 865, 113 S.Ct. 188, 121 L.Ed.2d 132 (1992) (citation omitted); *see also Istim, Inc. v. Chemical Bank*, 78 N.Y.2d 342, 348, 581 N.E.2d 1042, 1044, 575 N.Y.S.2d 796, 798 (1991) (applying interests analysis); *In re Estate of Clark*, 21 N.Y.2d 478, 485–86, 236 N.E.2d 152, 156, 288 N.Y.S.2d 993, 998 (1968) (same); *In re Crichton's Estate*, 20 N.Y.2d 124, 133, 228 N.E.2d 799, 805–06, 281 N.Y.S.2d 811, 819 (1967) (same); *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 279 A.D.2d 408, 408–09, 720 N.Y.S.2d 102, 103–04 (1st Dep't 2001) (same).[15]

██ *1. Actual Conflict of Law.* In the case at bar, the Republic of Indonesia and the State of New York apply the same general rules to property disputes. The Republic of Indonesia offers the only specific rules—Indonesian statutes and regu-

---

**14.** Any "resort to federal common law to fill the interstices of our federated legal system, must be warranted by overriding and compelling federal concerns." *Pescatore*, 97 F.3d at 10 (citation and internal quotation marks omitted); *accord O'Melveny & Myers v. FDIC*, 512 U.S. 79, 87, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (noting that "cases in which judicial creation of a special federal rule would be justified ... are ... few and restricted") (citation and internal quotation marks omitted). The Ministry's proffered interest, the uniform application of federal law, Ministry Reply Br. at 16, is "insufficient to justify imposition of federal common law," because of its "generic" and "generalized" nature. *Pescatore*, 97 F.3d at 11 (citing *O'Melveny*, 512 U.S. at 88, 114 S.Ct. 2048).

**15.** KBC argues that "the law of the situs of the disputed property generally controls." Appellee's Br. at 34. (citing 19A N.Y. Jur.2d Conflict of Laws §§ 26, 27, 31). But the New York Court of Appeals explicitly rejected the "traditional situs rule" in favor of interest analysis in *Istim*, 78 N.Y.2d at 347, 581 N.E.2d at 1044, 575 N.Y.S.2d at 798.

lations—that determine the respective rights of Pertamina and the Republic of Indonesia in the disputed funds. New York law directs us to apply these Indonesian statutes and regulations. There is thus no actual conflict of law.

Under New York law, the party who possesses property is presumed to be the party who owns it. *See Pollock v. Rapid Indus. Plastics Co.*, 113 A.D.2d 520, 525, 497 N.Y.S.2d 45, 49 (2d Dep't 1985) (noting that "possession of tangible property ... creates a rebuttable presumption of ownership"). When a party holds funds in a bank account, possession is established, and the presumption of ownership follows. *See Kolodziejczyk v. Wing*, 261 A.D.2d 927, 928, 689 N.Y.S.2d 825, 825 (4th Dep't 1999) (joint bank account creates rebuttable presumption of ownership in joint possessors); *Perkins v. Guaranty Trust Co. of New York*, 274 N.Y. 250, 261, 8 N.E.2d 849, 853 (1937) (possession of stock certificates creates rebuttable presumption of ownership).

Similarly, the Indonesian Civil Code provides that "whoever is in control of movable goods ... shall be deemed to be the owner of such goods," Indonesian Civ. Code, art.1977, and the phrase "movable goods" includes cash held in bank accounts, Decl. of Robert N. Hornick ¶ 34.

Pertamina possesses the disputed funds. Under both New York and Indonesian law, we therefore proceed from the presumption that Pertamina owns the disputed funds. It is clear, however, that this presumption may be rebutted by evidence that the Republic of Indonesia actually controlled the disputed funds, or that Per-

tamina merely held the funds for the Republic of Indonesia, in the manner of a trustee.[16] *See Fragetti v. Fragetti*, 262 A.D.2d 527, 527–28, 692 N.Y.S.2d 442, 443 (2d Dep't 1999) (holding that joint bank account created presumption of joint ownership, which was rebutted by contrary evidence of the parties' intentions and relative control over the funds); *Vergari v. Kraisky*, 120 A.D.2d 739, 740, 502 N.Y.S.2d 788, 789 (2d Dep't 1986) (holding that certificate of title constituted prima facie evidence of ownership of a vehicle, which was rebutted by contrary evidence of the parties' relative dominion and control over the vehicle); *Kurtish v. Iskokovic*, 204 A.D.2d 847, 848, 612 N.Y.S.2d 263, 264 (3d Dep't 1994) (holding that a "constructive trust" exists between two parties when there is: (1) a confidential or fiduciary relation, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment); *Mendel v. Hewitt*, 161 A.D.2d 849, 850, 555 N.Y.S.2d 899, 900 (3d Dep't 1990) (stating that to determine whether a "constructive trust" exists, courts conduct "flexible" factual inquiries into the relationships between parties); *cf.* Decl. of Robert N. Hornick ¶ 34 (stating that under Indonesian law, possession establishes a presumption of ownership, but not stating that the presumption is irrebuttable). Under New York law, then, the property rights are determined by the underlying relationship between Pertamina and the Republic of Indonesia.

KBC urges us to apply New York law to this relationship, and thus, to the property rights in the disputed funds. Yet KBC has not pointed to any New York cases or statutes that purport to govern this kind of

---

**16.** As the district court stated, Pertamina's possession of the disputed funds "is not the end of the story. Under absolute Hornbook law, the Court must look past that and must recognize any property rights in that money which belong to any other parties ... such as

the right of a beneficiary to a trust or some similar kind of property right." Tr. of April 5, 2002 Hearing, at 80. KBC does not advance any contrary proposition of Indonesian law. *See* Petitioner–Appellee's Br. at 41, 44.

arrangement. The Republic of Indonesia is a foreign state, and Pertamina is a corporate entity of Indonesia, created by the legislative enactments and executive orders of the Republic of Indonesia. The relationship was created neither by contract nor by any other mechanism familiar to the laws of New York. It was established instead by provisions of Indonesian law uniquely applicable to the relationship itself: Law of the Republic of Indonesia Number 8 Year 1971 and Government Regulation of the Republic of Indonesia Number 41 of 1982. Under New York law, the meaning of these two provisions of Indonesian law determines the property rights of the parties. There is thus no actual conflict between the laws of New York and the laws of Indonesia.

■ *2. Interests Analysis.* In any event, even if there were such a conflict, we are confident that Indonesian law would govern under the "interests analysis" that would be applicable under New York choice of law rules. *Cf. Allstate,* 81 N.Y.2d at 225, 613 N.E.2d at 938, 597 N.Y.S.2d at 906 (holding that "there is no conflict between New York and New Jersey law," and that even if there were a conflict, "New Jersey law [would] govern[ ]"). As the New York Court of Appeals has explained,

> Applying interests analysis, we first look to the purposes of the statutes in conflict and identify the policies which the States seek to promote through application of their laws. Then, based upon the facts of the case which relate to the statutes' purpose, we determine which State has the greater interest in having its law applied.

*Istim,* 78 N.Y.2d at 348, 581 N.E.2d at 1044, 575 N.Y.S.2d at 798. In the case at bar, Indonesian law sets forth a set of rules specifically resolving the ownership and disposition of the particular funds in

dispute. *See, e.g.,* Government Regulation of the Republic of Indonesia Number 41 of 1982, Art. 5; Law of the Republic of Indonesia Number 8 Year 1971, Art. 15; *see also* Decl. of Sudargo Gautama ¶¶ 29–39 (describing the regulation of PSC revenues). More generally, Indonesian laws also reflect a significant national interest in the eventual fate of funds from LNG exploitation. An Indonesian Constitution "Elucidation" observes, "The earth and the waters and the natural riches contained therein are the fundamentals of the people's prosperity. Therefore they should be controlled by the State and be made use of for the greatest possible prosperity of the people." Elucidation of the Indonesian Const., Art. 33. Other Indonesian laws evince similar concerns. *See* Law Substituting Gov't Regulation No. 44 Year 1960; Law of the Republic of Indonesia Number 8 Year 1971. And, unlike New York's interests, Indonesia's interests implicate the particular circumstances at issue: the use of an Indonesian governmental instrumentality to generate funds in order to maintain satisfactory foreign exchange reserves.

In contrast, the New York statutory interests implicated here are relatively attenuated: (i) the creation and operation of trusts under New York law; (ii) the execution of sales contracts that operate under New York law to obtain funds for deposit in these trusts; (iii) New York's general interest "in defining and protecting the property interests of its citizens and those who do business there," *Koreag,* 961 F.2d at 351; and (iv) New York's "interest as an international clearinghouse and market place," *Indosuez,* 279 A.D.2d at 408–09, 720 N.Y.S.2d at 104 (citation and internal quotation marks omitted).

Moreover, these generic interests are only minimally implicated in this case. Both the LNG sales contracts and the

trust mechanism complete their operations before funds arrive in Pertamina's subaccount. Whatever interest New York has in proper application of its contract or trust law has *de minimis* application here. And we do not see how a decision to apply New York law would materially further New York's reputation as a cosmopolitan, as opposed to insular and provincial, financial center. Indeed, if this latter reason alone sufficed to mandate New York law, courts would never apply foreign law to cases involving property located in New York bank accounts, which has clearly not been the case. *Cf., e.g., Clark*, 21 N.Y.2d at 485–86, 236 N.E.2d at 156, 288 N.Y.S.2d at 998 (applying Virginia law to determine the ownership of property located in New York).

We conclude that even if there were a conflict between New York and Indonesian law, New York choice of law rules would mandate application of Indonesian law to determine the relative property interests of Pertamina and the Republic of Indonesia in the disputed funds.

## V. The Property Interests of the Republic of Indonesia and Pertamina in the Restrained Funds

There is some uncertainty about the theory pursuant to which KBC presses its claim to the attached funds. On the one hand, KBC argues that the disputed funds belong to Pertamina even as a matter of Indonesian law, and consequently can be attached. This theory of recovery therefore rests on the ownership of the disputed funds. On the other hand, KBC, in its brief and at oral argument, also suggested that it had been entitled to rely on Pertamina's ownership of the LNG funds, and due to that reliance, is now entitled to attach those funds, without regard to the funds' legal ownership.

We reject both arguments. Like the district court, we conclude that under Indonesian law, all of the disputed funds except for the Retention belong to the Republic of Indonesia, and that it would have been unreasonable for KBC to rely on the notion that Pertamina owned those funds.

### A. The Reliance Argument

■ KBC's reliance argument appears to run as follows: The Republic of Indonesia has established Pertamina as a separate legal entity, comparable to a private corporation, in order to do business with various other entities in international markets. When those entities make serious claims against Pertamina's assets, however, Pertamina disclaims ownership, and invokes the sovereign immunity protections of the Republic of Indonesia. KBC hints that Pertamina was a vehicle for the Republic of Indonesia to participate in international markets without fairly accepting the consequences of such participation.

This argument rests on the premise that when KBC entered into the geothermal energy contracts, KBC relied upon Pertamina's ownership of the disputed funds, and that it was reasonable for KBC to do so. We can find no evidence in the record to support these claims.

KBC has not elicited evidence from which a court could conclude that KBC actually relied upon any representation that Pertamina made about KBC's ability to recover from the disputed funds in the event of default. KBC does not allege that before or during the negotiation of the geothermal energy contracts, Pertamina made any oral or written representation about recovery in the event of default. The geothermal energy contracts contain no reference to Pertamina's obligations to make funds available in the event of default, nor do they make any mention of

LNG revenues. Neither Pertamina's separate legal status nor its previous title to the LNG supports the notion that Pertamina represented that it owned the disputed funds, or that the funds were available to KBC to satisfy a default. Moreover, neither fact establishes that Pertamina owns the proceeds from LNG sales, free of any prior obligations to the Republic of Indonesia.[17]

None of Pertamina's representations and actions, as reflected in the record, support the inference that Pertamina had an ownership interest in the disputed funds. To the contrary, Pertamina seems to have been entirely forthright about its lack of ownership rights. Pertamina's annual report, for example, states that "[r]evenue from LNG sales, after deduction of contractually agreed cost items, is shared between the Government (65%) and the contractor (35%). From the LNG operations *PERTAMINA earns one thirteenth (¹/₁₃) or approximately 5% from the Government's share." Pertamina Annual Financial Report 2000*, at 17 (emphasis added).

Although the TPAAs do not denominate the Republic of Indonesia as owner of the LNG proceeds, Pertamina presents undisputed evidence that it has consistently transferred all of its Production Sharing Percentage to the Republic of Indonesia's account at the Federal Reserve Bank of New York. And it was widely understood that the Republic of Indonesia relied on LNG funds to maintain its foreign currency reserves, which would have been more difficult had the funds belonged to Pertamina, rather than the Republic itself. *See* Decl. of Sahala L. Gaol. ¶¶ 11–12.

Further, the evidence of the LNG contracting process suggests that other persons dealing with Pertamina thought that Pertamina could not be relied on as a creditor. The LNG financing structure was designed to assure parties contracting with Pertamina that—while doing *LNG business* with Pertamina—they would not be left without financial recourse in the case of default. For instance, when money was needed to construct Pertamina's liquefaction facilities, the loan was *not* made directly to Pertamina. Rather, it was made to the trustee, Bank of America. The loan contracts described the "Borrower" as "Bank of America National Trust and Savings Association, solely as Trustee under the Trust Agreement [but] not in its individual capacity" and not "any one or more of the Producers [defined to include Pertamina]." Bontang VI Loan Agreement of March 4, 1997, at 4. The loan agreements further specified that debt payments must be made from the LNG proceeds in the trust *before* Pertamina or the PSC contractor obtained any profit. *Id.* at 18–19. The loan agreements therefore warranted that the borrowers' interest had priority over all other "obligations and liabilities," *id.* at 38, and the TPAAs provided for payment to Pertamina and the PSC contractor only *after* such debts were satisfied, *see, e.g.,* Bontang VI Trustee and Paying Agent Agreement of March

---

**17.** Nor can KBC rely on the structure or denomination of the disputed accounts at issue here to establish reliance. There is no evidence that KBC knew of the existence of the Bank of America trust accounts, let alone that it relied on their existence when contracting. KBC sought permission from the United States District Court for the Southern District of Texas to register its judgment in Delaware and California in addition to New York. Memorandum and Order of February 20, 2002, at 7. In New York alone, KBC served restraining notices on no less than seven banks. Writ of Execution and Order to Show Cause of February 22, 2002, at 5. This broadside approach suggests that KBC, while perhaps aware that LNG revenues existed and flowed through New York, knew nothing of these accounts, let alone who established or controlled them.

4, 1997, at 39. PSC contractors' interests were also protected through the trust such that they did not need to rely on access to Pertamina's assets in order to be paid. *See* Decl. of Ainun Na'im ¶ 22; Decl. of Robert Hornick ¶ 23(c). The TPAA mechanism thereby ensured that parties involved in the production of LNG never needed to rely on the independence and financial viability of Pertamina nor contend with Pertamina's potential sovereign immunity assertions, nor its willingness to comply with adverse judgments.

Other sophisticated commercial counterparties thus expressly sought contractual mechanisms to guarantee recovery without reliance on the accessibility of Pertamina's assets. This suggests that even if KBC had actually relied upon Pertamina's ownership rights, such reliance would not have been reasonable. Others were aware of complexities in the relationship between Pertamina and the Republic of Indonesia, and consequent limits on Pertamina's ability to satisfy judgments against it. We would think that KBC, no less than others, could have arranged similar protections. Having failed to bargain for such protection before the fact and having failed to identify any actual reliance, KBC now asks us in effect to rearrange *nunc pro tunc* the relations of Pertamina and the Republic of Indonesia in KBC's favor. In these circumstances, we see no reason why a sophisticated commercial entity should not be required to abide by the consequences of its bargain. We therefore reject KBC's reliance argument.

### B. The Property Interest Argument

■ As described above, the crux of the parties' disagreement about Indonesian law hinges on a provision of Government Regulation 41:

Article 5 (1) The retention (fee) received by Pertamina with regard to the Pro-duction Sharing Contract shall be 5% (five percent) of the Net Operating Income of the relevant Production Sharing Contract.

(2) The difference between portions received by Pertamina according to each Production Sharing Contract and the retention (fee) received by Pertamina as intended in paragraph (1) of this Article shall be the Government's portion.

Government Regulation of the Republic of Indonesia Number 41 of 1982, Art. 5. This provision, by using the possessive "Government's," mandates that all of the disputed funds, with the exception of the five percent that constitutes Pertamina's Retention, belong to the Republic of Indonesia. Thus, we agree that most of "the share denominated as 'Pertamina's' share under the PSCs belongs entirely to the Government," Decl. of Sudargo Gautama ¶ 4, with the exception of the Article 5(1) Retention.

KBC responds that "the 'Government's Portion' referenced in [Government Regulation 41] is not a property interest [but] simply a reference to the 'indebted obligations' [already] owed by Pertamina to the Government of Indonesia." Petitioner–Appellee's Br. at 46 (emphasis omitted). KBC contends that Law 8, the statute under which Regulation 41 was passed, creates these "indebted obligations." *Id.* at 14–16. Article 15 of Law 8 states that Pertamina's deposit of sixty percent of Net Operating Income from PSCs "shall constitute the payment" of corporate tax, various levies, and other contributions. Law of the Republic of Indonesia Number 8 Year 1971, Art. 15. KBC argues that the amount that Pertamina owes to Indonesia in taxes, levies, and contributions is the "Government's portion." The disputed funds are, in KBC's view, owned by Pertamina and owed to Indonesia.

But KBC's interpretation of Article 5 of Government Regulation 41 is inconsistent with the surrounding statutory text. While Article 5(2) identifies in mandatory terms what "shall be the Government's portion," the very next provision imposes a "tax," which it explicitly labels as such. Government Regulation of the Republic of Indonesia Number 41 of 1982, Art. 5(3). The presence of a parallel provision explicitly referencing "tax" obligations suggests that Article 5(2) describes a different kind of obligation. The terminology of Article 15 of Law 8 underscores this inference: It refers to payments that "constitute" corporate taxes, customs levies, and the like, Law of the Republic of Indonesia Number 8 Year 1971, Art. 15, which are distinguished from other obligations.

Further, Article 5(2) of Government Regulation 41 and Article 15 of Law 8 refer to different amounts. The former, which creates the "Government's portion," refers to the "*difference* between portions received by Pertamina according to each Production Sharing Contract and the retention (fee) received by Pertamina." Government Regulation of the Republic of Indonesia Number 41 of 1982, Art. 5 (emphasis added). That is, the Government portion comprises, with respect to each PSC, the total amount of the Net Operating Income, *less* the amount to which the particular PSC contractors are entitled, *less* five percent of the Net Operating Income—a sum that depends upon the exact percentage to which contractors are entitled under the PSC. And, as KBC's counsel explained at oral argument, this percentage varies from contract to contract, so that the "Government's portion" also varies above and below sixty percent of Net Operating Income. Thus, the "Government's portion" is a varying amount.

█ Article 14 of Law 8, in contrast, refers to a *fixed* "sixty percent of the net operating income from the operations of Production Sharing Contracts prior to the division between the Enterprise and the Contractor." Law of the Republic of Indonesia Number 8 Year 1971, Art. 14. The *fixed* sixty percent that is Law 8's "indebted obligation" therefore cannot be the same thing as the *varying* percentage of the Net Operating Income that is the "Government's portion."[18]

The record also contains uncontroverted evidence that Pertamina's share of the Net Operating Income is transferred directly to the Ministry's account at the Federal Reserve Bank of New York.[19] While this

18. Despite this discrepancy, KBC's expert argues that "Article 14 and 15 [of Law 8] were implemented by [Government Regulation 41]." Decl. of Robert Hornick ¶ 27. But as a matter of Indonesian law, government regulations are not implementing mechanisms for legislation. Indonesian law contains "a bewildering variety of types of laws—statutes, regulations, decrees, circulars, etc." Eddy Damian & Robert N. Hornick, *Indonesia's Formal Legal System: An Introduction*, 20 Am. J. Comp. L. 492, 523 (1972). Among the varieties of law enumerated in the aforementioned article are "Government Regulation[s]," "Presidential Decision[s]," "Regulation[s] of the Minister," and "internal memoranda." *Id.* at 524–25. This plethora of legal instruments in part ensues because the Indonesian executive branch has "considerably more executive law-making discretion than is the case, e.g. in the legal system of the U.S." *Id.* at 529. And under Indonesian law, "[e]ven statutes passed by the House of Representative commonly look[] to the executive orders and Presidential speeches for their inspiration and legal base." *Id.* at 507. Given the discrepancy in meaning between Law 8 and Government Regulation 41, we conclude that these rules do not exist in the hierarchal relationship described in the declaration of KBC's expert.

19. Pertamina introduced testimony that its long-standing practice has been to hand over funds from PSCs directly to the Republic of Indonesia through a transfer to the Federal Reserve Bank of New York. *See* Decl. of Ainun Na'im ¶ 23 (noting that "standing instructions

does not prove that the Republic of Indonesia has an ownership interest in such funds, it is consistent with such a conclusion.

 We also agree with other Courts of Appeals that have suggested that a foreign sovereign's views regarding its own laws merit—although they do not command—some degree of deference. *See, e.g., Access Telecom, Inc. v. MCI Telecommunications Corp.*, 197 F.3d 694, 714 (5th Cir.1999), *cert. denied*, 531 U.S. 917, 121 S.Ct. 275, 148 L.Ed.2d 200 (2000) ("Recognizing the difficulty of interpreting foreign law, courts may defer to foreign government interpretations."); *see also In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1312 (7th Cir.1992) ("A court of the United States owes substantial deference to the construction France places upon its domestic law."). That Indonesia is a party to the case does not blunt this comity concern. *See Société Nationale Industrielle Aérospatiale v. United States Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 546, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) ("[W]e have long recognized the demands of comity in suits involving foreign states, either as *parties* or as sovereigns with a coordinate interest in the litigation." (emphasis added) (citing *Hilton v. Guyot*, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895))). Where a choice between two interpretations of ambiguous foreign law rests finely balanced, the support of a foreign sovereign for one interpretation furnishes legitimate assistance in the resolution of interpretive dilemmas. The Republic of Indonesia, of course, insists that Pertamina's reading of the relevant Indonesian law is correct. We thus conclude that Pertamina does not own any portion of the disputed funds, with the

exception of the Retention. Like a trustee, Pertamina possesses the remaining funds but has no ownership interest in them. *Cf. Wulff v. Roseville Trust Co.*, 164 A.D. 399, 404–05, 149 N.Y.S. 683, 687 (1st Dep't 1914) ("Property which a debtor holds in trust for others ... is not subject to an attachment issued against his property.").

## C. The Retention

 Pertamina also argues that it has no right to the Retention, or, at a minimum, no right to eighty percent of the Retention. We disagree. While Pertamina may be under an obligation to transfer the Retention to the Ministry's account in New York, this fact does not alter the extant allocation of ownership interests. Pertamina has not identified any Indonesian statute or regulation that grants the Republic of Indonesia ownership rights in the Retention. "[U]nder New York law, a defendant has an interest in ... funds if any part of the money is within the present or future control of the defendant." *Gala Enterprises, Inc. v. Hewlett Packard Co.*, 970 F.Supp. 212, 217 (S.D.N.Y.1997) (citation and internal punctuation omitted); *accord Leon v. Martinez*, 84 N.Y.2d 83, 88 n. 1, 638 N.E.2d 511, 513 n. 1, 614 N.Y.S.2d 972, 974 n. 1 (1994) ("An assignment may properly relate to a future ... right which is adequately identified....."). As property within Pertamina's control, which only Pertamina controls, the Retention is validly subject to attachment.

## CONCLUSION

The district court correctly adjudicated the relative ownership interests of the Republic of Indonesia and Pertamina. We therefore affirm the district court's order

to [Bank of America exist] to pay its Production Sharing Percentage to the account of the Government of Indonesia"); Supp. Decl. of

Sahala L. Gaol. ¶ 3 (same). Such *standing instructions* were given in March 1997, prior to the Swiss arbitration in the case at bar. *Id.*

granting KBC's motion to attach the Retention and denying KBC's motion to attach the remainder of the disputed funds. Because this is not an appeal from a final judgment, proceedings in the district court will presumably move on to other matters. We direct the district court, in the course of those proceedings, to continue the stay presently in force or to substitute one similar until such time as the parties' rights to the disputed funds are finally determined.